NOTICE

Decision filed 02/01/10. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-05-0723

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

DORA MAE JABLONSKI and JOHN L. ) Appeal from the
JABLONSKI, JR., as Special Administrator ) Circuit Court of
and Personal Representative of the Estate of ) Madison County.
John L. Jablonski, Sr., )
)
     Plaintiffs-Appellees, )
)
v. ) No. 03-L-2027
)
FORD MOTOR COMPANY, )
)
     Defendant-Appellant, )
)
and )
)
NATALIE S. INGRAM, ) Honorable
) A. A. Matoesian,
     Defendant. ) Judge, presiding.

_____

JUSTICE STEWART delivered the opinion of the court:

The plaintiffs, Dora Mae Jablonski (Dora) and John L. Jablonski, Jr., as the special administrator and personal representative of the estate of Dora's deceased husband, John L. Jablonski, Sr. (John), brought this action against Ford Motor Company (Ford), alleging strict product liability and negligence in the design of their 1993 Lincoln Town Car automobile as a result of a collision in which John was killed and Dora was seriously injured. Specifically, the plaintiffs alleged that the fuel tank system in the Lincoln Town Car was defective, unreasonably dangerous, and negligently designed by Ford. The plaintiffs also filed a negligence claim against Natalie S. Ingram, the driver of the vehicle that collided with the Jablonskis' vehicle, but that claim was settled before the trial. Plaintiff Dora Jablonski moved prior to the trial for leave to file a willful-and-wanton-conduct count and to seek

1

punitive damages, and after a hearing, her motion was granted by the trial court. The plaintiffs voluntarily dismissed their strict product liability claims at the close of all the evidence, and the case against Ford was submitted to the jury on the negligent-design claims and on the willful-and-wanton-conduct claims seeking punitive damages. The jury returned a verdict against Ford, assessing the plaintiffs' total damages in excess of $43 million, including $15 million in punitive damages, on which the circuit court of Madison County entered a judgment. The circuit court denied Ford's motion for a judgment notwithstanding the verdict or for a new trial. Ford timely appeals from the judgment.

Ford raises numerous claims of error, which we restate generally as follows: the trial court erred (1) in submitting any of the plaintiffs' negligent-design claims to the jury, (2) in making various evidentiary rulings, (3) in instructing the jury on the negligence claims, and (4) in submitting Dora's punitive damages claim to the jury and instructing the jury on that claim. Due to the nature and complexity of the many issues raised on appeal by Ford, we must provide an extensive review of the evidence produced at the trial. Additional facts will be provided where necessary. For the reasons set forth below, we affirm.

BACKGROUND

This case arose from a July 3, 2003, automobile accident in which Dora and John were traveling in their 1993 Lincoln Town Car, which was the last car in a line of traffic stopped at a construction site on Interstate 270, near its intersection with Illinois Route 203, in Madison County, Illinois. Ingram, who was driving a 1995 Chevrolet Lumina, while distracted and looking for her sunglasses, rear-ended the Jablonskis' vehicle. At the point of the collision, she was traveling at least 56 miles per hour and by some estimates 65 miles per hour. According to witnesses, Ingram did not brake or leave skid marks, and she struck the rear of the Jablonski vehicle dead center. As a result of the collision, the fuel tank in the Lincoln Town Car was crushed, a pipe wrench located in the trunk of the Jablonskis' car

2

penetrated the fuel tank, and a fire immediately ensued. It is undisputed that gasoline leaking from the damaged fuel tank caused the fire.

Both Dora and John were eventually able to exit their vehicle but were engulfed in flames and suffered severe burn injuries. John suffered burns over 80% of his body and died two days later as a result of his burn injuries. Dora suffered burns over 32% of her body, including her face, and by the time of the trial, she had suffered through extensive burn treatment, reconstructive surgery, and rehabilitation. She will need extensive care and treatment for the remainder of her life. At the time of the accident, John was 74 and Dora was 71. They had been married for more than 50 years and had raised four children. The extent of the Jablonskis' injuries and the medical expenses associated with those injuries are not disputed. Ford does not challenge the amount of the verdict and makes no claim that either the compensatory damages or the punitive damages are excessive.

The plaintiffs' negligence claims were focused upon the design of the fuel tank system in the 1993 Lincoln Town Car. Evidence presented by both parties revealed that the Lincoln Town Car, the Mercury Grand Marquis, the Ford Crown Victoria, and the Ford Crown Victoria Police Interceptor (Police Interceptor) are all "Panther platform" vehicles. Ford developed the Panther platform and first introduced it in the 1979 model year. The characteristics of Panther platform vehicles include a large, deep trunk, a solid axle, rear-wheel drive, and body-on-frame construction. The fuel tank in Panther platform vehicles is located forward of the trunk, behind the rear axle and between the rear wheels, a configuration known as an "aft-of-axle" or "vertical-behind-the-axle" fuel tank. While aft-of-axle fuel tanks were common when the Panther platform was developed in 1979, Ford has placed the fuel tank forward of the axle in every new passenger car platform it has since designed. By 1991, a majority of all the new automobiles manufactured had fuel tanks forward of the axle. At the time of the trial, the Panther platform vehicles and the Mustang

3

were the only types of vehicles Ford still manufactured with an aft-of-axle fuel tank.

The plaintiffs presented exhibits, including Ford records, and the testimony of Ford employees which the plaintiffs argued revealed that Ford had long been aware of the potential dangers associated with the aft-of-axle fuel tank design, including the danger of objects in the trunk puncturing the fuel tank in a collision. In the late 1960s, Derwyn Severy, a researcher at UCLA, conducted a series of automobile collision experiments, partially funded by Ford, for the purpose of obtaining "information relating to the injury exposure for high-speed rear-end collisions, including the lethal hazard of gasoline-fed post[]crash fires." The Severy research resulted in an article in a publication of the Society of Automotive Engineers, which was introduced into evidence. The article included this conclusion among its findings:

> "Initial findings indicate that much progress can be made in reducing the possibility of crash fires by incorporation of relatively inexpensive design considerations relating to fuel tanks and related fuel systems. *** Preliminary studies suggest that the area cradled by the rear wheels, above the rear axle and below the rear window[,] represents an improved location for the fuel tank. This location is least often compromised from collisions of all types."

On October 3, 1969, Roger Daniel, a safety engineer at Ford, sent a handwritten memo to his superiors at Ford entitled "Future Gas Tank Location." In the memo, Daniel stated his understanding that the "future direction as to fuel tank location is to hang the tank under the trunk," and he asserted that "for all vehicles except wagons and convertibles, the best tank location by far appears to be directly above the axle." Daniel stated that an advantage of this design was that it would be "almost impossible to crush the tank from the rear." On January 23, 1970, Daniel prepared a typewritten memo, also signed by Robert Fredericks, Ford's principal research engineer for safety engineering, which stated as follows:

4

"We have examined possible fuel tank locations and determined that the safest place for a fuel tank is directly above the rear axle and below the package tray. In rear[-]end accidents, the tank is above and forward of vehicle components likely to crush during the collision or deform it, while in lateral accidents, the tires, axle, and wheelhouse structure provide extensive protection against rupture or even excessive deformation."

The memo described the proposed tank location in detail and concluded that in that location the tank "is high enough in the trunk to essentially preclude rupture from in-trunk articles during an accident." On February 9, 1971, Ford prepared a "Cost Engineering Report" to determine the potential cost of moving the fuel tank to the above-the-rear-axle location. The report concluded that the cost of the design change at that time would have been $9.95 per vehicle. This design change was not incorporated into the 1979 Panther platform.

The plaintiffs introduced excerpts of an evidence deposition of Kenneth K. Kohrs that had been taken in another case on February 26, 1992, just prior to the production of the Jablonskis' Lincoln Town Car. At that time, Kohrs was the vice president of car product development for Ford, which he agreed meant that he was the person with "the highest direct responsibility for the engineering design and development of private passenger automobiles sold in North America." He testified that he understood he was testifying as a representative of Ford and acknowledged that "it is Ford's position that the automotive industry should incorporate in a new product the latest state of the art with regard to overall vehicle safety that is feasible from a high volume production standpoint." Kohrs stated that Ford has "always been aware of [its] responsibility to minimize the effect of post[]crash fires and the need to continually reduce the incidence." He further acknowledged that Ford had produced fuel system designs for the Fox platform vehicle which incorporated shields for the fuel tank. He also admitted that Ford had produced the Capri for the European market in the 1970s and

that the Capri had an above-the-rear-axle fuel tank. Kohrs acknowledged that the location of the fuel tank in the Capri had been marketed by Ford as a safety feature and that the Capri had passed a 30-mile-per-hour fixed-barrier crash test.

Brian Geraghty, a Ford employee for more than 40 years, who, at the time of the trial, was the director of Ford's design analysis office, was called by the plaintiffs as an adverse witness. Geraghty testified that before the Jablonskis' accident on July 3, 2003, Ford knew that there had been police car collisions in which the fuel tank was punctured, resulting in fires and the deaths of the occupants. Ford was aware that between 1983 and 2003, five deaths and seven injuries resulted from collisions in which items in the trunk had punctured the fuel tank. The police cars involved in these accidents were Police Interceptors that were built on the Panther platform. Geraghty acknowledged that the state police agencies in both Florida and Arizona had requested that Ford study the issue of fires caused by the puncture of fuel tanks by items in the trunk as a result of rear-end collisions. Geraghty identified an exhibit prepared by Dr. Michelle Vogler, at the request of Ford, for the Arizona Highway Patrol, with statistics concerning the fire risk in various vehicles involved in fatal rear-end collisions. The data in that exhibit indicated that Lincoln Town Cars were involved in fatal rear-end collisions more than three times more often than Ford Escorts, a much smaller vehicle designed with a forward-of-the-axle fuel tank. Geraghty also identified an exhibit indicating that in the years 2002 to 2003, there were more than 15 million registered vehicles in the United States that had their fuel tanks located behind the axle but that, at the time of the trial, no vehicles on that list were still being manufactured or sold with a fuel tank in that location, except Ford's Panther platform vehicles.

The plaintiffs introduced as admissions, and read to the jury, excerpts from a deposition of Michael J. Harrigan, Sr., taken in another case on December 11, 2003. Harrigan had worked in the design of fuel systems at Ford since 1977. In 1986, he became

the chairman of the Fuel Systems Technical Standards Committee of the Society of Automotive Engineers. The committee includes approximately 50 individuals employed by various automobile manufacturers and automobile component part manufacturers. Its purpose is to develop standards and recommended practices for the automotive industry in the design of fuel systems. Harrigan also taught a class on fuel systems engineering to Ford engineers beginning in 1991. Portions of the 2000 version of the class manual were introduced into evidence. Harrigan agreed that he is an expert in "fuel system design standards."

Harrigan acknowledged that since the introduction of the Escort in 1981, all the passenger cars designed at Ford have been designed with the fuel tank forward of the axle. He confirmed that Ford's preferred fuel tank location is forward of the axle, but he acknowledged that the fuel tank design for Panther platform vehicles had not changed since their introduction in 1979. Harrigan agreed that a part of the role of the engineer in designing a fuel system for an automobile is to protect the customer. He testified that engineering standards require that a fuel system be designed to avoid allowing anything to penetrate or puncture the fuel tank in a crash. If a hazard is identified that the design cannot prevent from occurring, Harrigan agreed that shielding should be employed. He acknowledged that Ford had used high-density polyethylene shielding to shield fuel tanks in some of its vehicles since the 1970s, and he agreed that the shielding was technically and economically feasible to use.

The manual for the fuel systems engineering class that Harrigan used to teach Ford engineers provides that it is the "engineer's role" to "eliminate potential hazards" in the product. The manual then states that if the engineer cannot "design [a] hazard out of the product," he should "design a guard or shield." As a "last resort" the engineer is taught to "provide a clear warning" if the hazard cannot be designed out of the product and an

7

appropriate guard or shield cannot be designed. Finally, the manual provides that the engineer should consider not releasing the product if a hazard still exists.

Cam Cope, an expert consultant who determines the cause and origin of vehicle fires, testified for the plaintiffs that the major cause and the original source of the Jablonskis' fire was the pipe wrench that was propelled through the trunk wall and into the fuel tank. He also opined that the collision caused a smaller hole in the fuel tank and that the smaller hole was another likely source of the fire.

Mark Arndt testified as an expert witness for the plaintiffs. He has a bachelor's degree in mechanical engineering and specializes in automotive engineering. For approximately 20 years, he has provided consulting services regarding motor vehicle crashes, particularly those involving postcrash fires, and in that capacity he has investigated thousands of crashes involving fires. He is a member of the Society of Automotive Engineers and served on its Fuel Containment Standards Committee, which is charged, in part, with the responsibility for developing standards and recommended practices for the design of fuel systems in motor vehicles. He has also published peer-reviewed articles on postcrash vehicle fires and on the analysis of similar incidents to determine product safety.

In preparation for his testimony, Arndt and his staff examined and photographed the Jablonskis' Lincoln Town Car, removed the fuel tank, and performed a detailed analysis of this accident. He also performed an analysis of other similar incidents. Arndt compiled a list of 44 accidents between 1981 and 2003 involving postcrash fires in rear-impact collisions of Ford automobiles. Most of the vehicles involved were Panther platform automobiles, and all of them were designed with a vertical-behind-the-axle fuel tank. Many of the occupants of the vehicles suffered severe burn injuries or died of burn injuries. Arndt's list included 11 incidents, prior to the Jablonskis' accident, involving Police Interceptors where the fuel tank was punctured by an item located in the trunk. Arndt had personally investigated

8

approximately 20 of the incidents on the list, and he relied upon the list of incidents in forming his opinions. Arndt also prepared and relied upon a separate list of similar incidents that had been compiled from an interrogatory answer filed by Ford in another case in 1992. That list was also introduced into evidence and included 416 accidents involving Ford vehicles with behind-the-axle fuel tanks in which the fuel tank was torn, punctured, or split open, and it revealed 378 fatal burn injuries.

Arndt expressed the opinion that the pipe wrench located in the trunk of the Jablonskis' vehicle penetrated the front and rear walls of the fuel tank, causing the two larger holes in the fuel tank. He also noted that an additional, smaller hole in the fuel tank was caused by the crushing of the low-fuel reservoir in the fuel tank. Arndt confirmed that the low-fuel reservoir had also penetrated the fuel tank in one of the prior similar incidents described in an exhibit.

From the standpoint of safety, Arndt opined that there are basic engineering standards for the design of products. Once a hazard is identified, the engineer should attempt to design the hazard out of the product. If the hazard cannot be eliminated in the design process, then the engineer should design a guard or shield to protect the consumer from the hazard. If the guard or shield does not eliminate the hazard, then the consumer should be provided with a warning describing how to prevent the potential harm in the product.

In Arndt's opinion, the fuel containment system in the Jablonskis' 1993 Lincoln Town Car was defective in that the fuel tank was located in the likely crush zone in a rear-end collision and was vulnerable to being punctured by items in the trunk. At the time of the manufacture of the Jablonskis' automobile, a safer and more practical location for the fuel tank would have been forward of the axle. Further, if Ford did not change the location of the fuel tank, it should have provided shields that protected it from being punctured by other component parts of the vehicle or items in the trunk and a guard that enabled consumers to

9

align items in the trunk laterally so they would be less likely to puncture the tank. Finally, Ford should have provided the consumer with a warning of the danger of objects in the trunk puncturing the fuel tank.

The plaintiffs also introduced evidence regarding postcrash fires in rear-end collisions involving Panther platform Police Interceptor vehicles subsequent to the sale of the Jablonskis' 1993 Lincoln Town Car but before the 2003 accident. During this 10-year period, law enforcement agencies became increasingly aware of high-speed rear-end collisions in which police officers were injured or killed in postcrash fires in Police Interceptors. Typically, these accidents occurred when the officers were stopped on the side of major highways and were performing their duties. In some incidents, the fuel tank was breached by being crushed against component parts of the vehicle, and in others it was damaged by trunk contents. As a result of these incidents, police agencies began making complaints to Ford and to the National Highway Traffic Safety Administration (NHTSA).

In 2001, as a result of these complaints, Ford issued a Technical Service Bulletin (TSB), which was sent to all the Ford dealers. The TSB applied to 1992 to 2001 Crown Victorias, 1992 to 2001 Lincoln Town Cars, and 1992 to 2001 Mercury Grand Marquis. It noted that police agencies had reported postcrash fires in high-speed rear impacts, and it provided a recommended service procedure for vehicles "exposed to extremely high-speed rear impacts." Specifically, it instructed dealers to replace a hex-head bolt on a park-brake cable with a round-head bolt and to grind down a metal tab that protruded from a "U" bracket on the rear stabilizer bar axle attachment. These parts had been identified as having breached the fuel tank in high-speed rear-end collisions. The issuance of the TSB prompted the NHTSA, in October 2001, to open an investigation into postcrash fires in Ford's Panther platform vehicles. That investigation was completed in October of 2002, and the NHTSA required no action by Ford.

During 2002, police agencies continued to complain about the danger of postcrash fires, and government officials in both Florida and Arizona suggested that a moratorium should be declared on future purchases of Panther platform vehicles for use by law enforcement. In March of 2002, Janet Napolitano, then the Attorney General of Arizona, wrote a letter to Ford expressing concern about the incidence of fuel-fed fires in Police Interceptors. In June of 2002, Ford representatives met with Napolitano and then announced the formation of a "Blue Ribbon Panel" of Ford and law enforcement representatives that committed to a 90-day program to evaluate fuel system upgrades and police procedures as a part of a "Police Officer Safety Action Plan."

In September of 2002, Ford and the Arizona Attorney General's office held a joint press conference and announced the actions taken and to be taken as a result of the 90-day program. First, Ford announced that it had developed a Police Interceptor package upgrade kit (Upgrade Kit). The Upgrade Kit consisted of shields designed to protect the fuel tank from being punctured by component parts identified as puncture hazards in high-speed rear-end collisions. Ford had crash-tested the shields at 75 miles per hour and had found them effective. Second, the Blue Ribbon Panel announced recommendations for improved police safety procedures, including "Trunk Packing Considerations,[1]" which advised officers on the placement of items in the trunk to reduce the potential for the fuel tank being ruptured by trunk contents. Third, Ford announced the development of an optional "Trunk Pack," consisting of a drop-in trunk liner made of high density polyethylene, which required the user to place objects in the trunk laterally rather than longitudinally. A sticker located on the

---

[1]The material developed by Ford refers to "Trunk Packing Considerations." However, the jury instructions used the phrase "Trunk Pack Recommendations." The two phrases were used interchangeably during the trial. We will use both phrases in this opinion and, to the extent possible, as they appear in the record.

11

Trunk Pack instructed the user to "align hard or sharp police equipment laterally." Finally, Ford announced the creation of a Web site where the law enforcement community could find information about the work of the Blue Ribbon Panel and updates on Ford's Police Interceptor design-safety efforts.

In October of 2002, Ford notified, by first class mail, all the registered owners of Police Interceptors and all the United States Ford, Lincoln, and Mercury dealers of the availability of the Upgrade Kit. In March of 2003, Ford also notified its 32,000 government fleet customers. The Trunk Packing Considerations were available through the Web site and with the purchase of the optional Trunk Pack. Civilian owners of Panther platform vehicles, including the Jablonskis, received no notice of the availability of the Upgrade Kit, Trunk Pack, or Trunk Packing Considerations. The decision not to notify civilian users of Panther platform vehicles was made by Sue Cischke, a vice president and officer of Ford and the highest-ranking Ford employee responsible for vehicle safety. Cischke testified by deposition that Ford chose not to notify civilian users because it was Ford's opinion that the risk of fuel-fed, postcrash fires in high-speed rear-impact collisions is unique to police users because police officers have significantly greater exposure to that type of collision.

Ford, in its defense, presented extensive documentary and testimonial evidence in support of the safety of Panther platform vehicles. It defended the design of the 1993 Lincoln Town Car with the testimony of experts who opined that there was no defect in the fuel system, that a change in the location of the fuel tank would reduce the effectiveness of other desirable attributes of the Panther platform vehicles, and that, considering the overall design of the Panther platform vehicles, the fuel tank is in the best location for that vehicle. Ford also presented evidence that the Panther platform met and exceeded all United States government safety standards for its fuel containment system. Further, Ford introduced the NHTSA report on its investigation into the safety of the Panther platform fuel system in

12

which the NHTSA neither recommended nor required any change in Ford's design. Ford presented testimony that millions of Ford Panther platform vehicles had been driven for years with a small incidence of postcrash fires, suggesting that the design of the fuel system was reasonably safe. Finally, Ford presented evidence that the Jablonski accident was a unique occurrence since it was the only crash known in a Panther platform vehicle other than a Police Interceptor in which trunk contents punctured the fuel tank; therefore, Ford argued, a design change based upon such an unlikely occurrence was not warranted.

Jack Ridenour, Jr., is a Ford employee in the design analysis department who heads a team of engineers who analyze the performance of Ford vehicles in the field, investigate crashes, and consult with engineers designing future vehicles. Among other duties, he analyzes the performance of fuel systems on Ford vehicles in crashes. As a mechanical engineer, Ridenour joined the fuel system design group at Ford in 1971 and worked in that group until 1977, designing and developing fuel systems for Ford. He has taught the fuel system engineering classes at Ford. Ridenour investigated the Jablonskis' accident and offered opinions about the safety of the 1993 Lincoln Town Car and the design of Panther platform vehicles.

Ridenour testified that when he began working at Ford in 1971, Ford was well aware of the Severy research introduced by the plaintiffs. According to Ridenour, the Daniel memos introduced by the plaintiffs represent further research Ford did in response to the Severy article. Further, the document showing that Ford analyzed the cost of incorporating the design changes advocated by Severy and Daniel at $9.95 per vehicle confirmed that Ford was considering alternatives. Ridenour agreed that the over-the-axle design advocated by Severy and Daniel was superior to the under-the-trunk location for the fuel tank which was then being used, but he noted that those alternatives did not include the vertical-behind-the-axle location ultimately adopted for the Panther platform. According to Ridenour, once Ford

13

had fully tested the over-the-axle location, it was determined that it was not a workable design.

Ridenour described the possible tank locations and explained the overall design process. He opined that there is no optimum fuel tank location for all cars. The design of the fuel system depends upon the design of the car, and the fuel system used by Ford in the Panther platform vehicles was designed for that type of car. The Panther platform vehicle is a large passenger automobile with a body-on-frame construction, rear-wheel drive, and a spacious trunk. If the fuel tank were moved in the Panther platform vehicle to the forward-of-the-axle location, the body-on-frame construction and rear-wheel drive would also have to be eliminated, and it would be a totally different car. In his opinion, the vertical-behind-the-axle fuel tank location was the best and safest design for the 1993 Lincoln Town Car and provided the most protection for occupants from all types of crashes.

During his testimony, Ridenour identified, and Ford introduced into evidence, the certification package for 1993 Panther platform vehicles, including the Town Car, in which Ford certified that all of its Panther platform vehicles met federal motor vehicle safety standards. Federal Motor Vehicle Safety Standard (FMVSS) 301 required that a vehicle withstand, with minimum fuel leakage, a rear impact with a nondeformable 4,000-pound barrier moving at 30 miles per hour. The 1993 Lincoln Town Car met this standard. In fact, the certification package revealed that Ford performed the FMVSS 301 testing at 35 miles per hour, and that the Town Car had passed. Ford also performed more rigorous internal testing which required that the Lincoln Town Car withstand, with minimal fuel leakage, three separate car-to-car fuel-system-integrity crash tests performed at 50 miles per hour, and the 1993 Town Car passed that testing as well. According to Ridenour, at the time of the production of the 1993 Lincoln Town Car, only Ford and General Motors had internal standards requiring testing at 50 miles per hour.

14

Ridenour acknowledged the design standards in Ford's fuel system engineering materials which require that an engineer design a hazard out of a product, guard against it, or provide a warning, but he testified that, in his opinion, Ford met those standards in the design of the Panther platform vehicles. He testified that Ford performed a thorough design review and located the fuel tank in the safest place for Panther platform vehicles. He also opined that Ford guarded against a penetration of the fuel tank by placing a steel trunk wall between the rear of the vehicle and the fuel tank. Ridenour testified that no warning was necessary, either in 1993 when the Jablonski vehicle was produced or thereafter, with regard to the danger of trunk contents puncturing the fuel tank. In his opinion, it was not reasonably foreseeable that a pipe wrench would puncture the fuel tank since Ford was unaware of any such incidents by 1993 and, prior to the Jablonskis' accident had knowledge of trunk content punctures in police vehicles only. Finally, Ridenour testified that, in his opinion, the Panther platform vehicles, including the Jablonskis' 1993 Lincoln Town Car, are reasonably safe in high-speed rear-end collisions.

Walter Newell is the president and the lead investigator of Newell Investigative Services. He was hired by Ford to investigate the cause and origin of the Jablonski vehicle fire. At the time of the trial, he had been a fire investigator for 23 years and had investigated more than 3,000 vehicle fires. A majority of the postcollision vehicle fires he had investigated involved vehicles with aft-of-axle fuel tanks. Newell agreed with the opinion of the plaintiffs' expert, Cam Cope, that the primary cause of the Jablonski vehicle fire was the leakage of fuel from the fuel tank as a result of the holes caused by the pipe wrench. He disagreed with Cope's additional conclusion that the smaller hole caused by the crushing of the low-fuel reservoir was a contributing cause of the fire.

Ford called Dr. John Habberstad, a mechanical engineer and an expert in accident reconstruction, as an expert witness. Habberstad had been involved in accident

15

reconstruction for 35 years and had investigated more than 2,000 accidents. Based upon his investigation of this accident, he testified that the speed of Ingram's vehicle at impact was 65 miles per hour. He further testified that he had been involved in the investigation of many accidents in which a fuel tank was breached, and he stated that he had never observed a tank punctured by an item in the trunk. Finally, in his opinion, if the Upgrade Kit shields developed by Ford had been installed on the Jablonski vehicle, they would have had no effect on this accident.

Mark Noble, a mechanical engineer and an expert in the analysis of auto accidents, was called as an expert witness by Ford. Noble began his career as an engineer in the fuel system department at Chrysler Corp. (Chrysler). Eventually, he supervised that department and was responsible for the design of the fuel systems in Chrysler vehicles. In 1980, he left Chrysler and has since worked as an expert in the analysis of auto accidents.

In Noble's opinion, the Jablonski accident was a unique occurrence that resulted from a combination of factors not likely to be repeated. In his view, the speed of the Chevrolet Lumina that struck the Jablonski Town Car, the configuration of the Lumina, the alignment of the vehicles at impact, the location and alignment of the pipe wrench in the trunk, the type of trailer hitch on the Town Car, and other factors all combined to cause the pipe wrench to penetrate the fuel tank. Noble noted that, out of millions of Town Cars, this is the only known accident in which the fuel tank has been breached by an item in the trunk. If all the Panther platform vehicles are included, this is the only known incident in a non-police vehicle. According to Noble, this type of incident is so rare that the risk of trunk contents puncturing the fuel tank should be given little consideration in designing a fuel system.

Noble opined that there is no optimum fuel tank location for all cars but that there may be an optimum location for a particular vehicle. In designing the location of a fuel tank, the features of a particular vehicle should be taken into account. According to Noble, the

Town Car has features that reduce the risk of fuel tank punctures, including a steel frame, a steel floor pan, and a deformable steel tank, as well as the fact that the tank is 40 inches from the rear bumper. In his opinion, the optimum location for the fuel tank in the 1993 Lincoln Town Car was the vertical-behind-the-axle location, as it was designed. Finally, it was Noble's opinion that the 1993 Lincoln Town Car is a "very safe overall vehicle" with a "very safe" fuel tank location.

Sue Cischke, called as a witness by Ford, reiterated and expanded her testimony provided by deposition during the plaintiffs' case. As the highest-ranking safety officer at Ford, she explained Ford's safety philosophy in the design of its products. First, Ford meets all federal safety standards. Second, it makes voluntary agreements with other manufacturers to improve product safety and then treats compliance with those agreements the same as federal safety standards. Third, Ford has internal safety standards beyond the federal standards that it monitors with extensive product testing. Fourth, it strives to meet public domain guidelines such as those promoted by Consumer Reports. Finally, Ford continually develops and offers enhanced safety features.

Cischke identified the NHTSA report of its investigation into postcrash fires resulting from high-speed rear-end collisions in Panther platform vehicles, and the report was admitted into evidence. The report required no action by Ford and, according to Cischke, supported her decision not to notify nonpolice users of Panther platform vehicles of the danger of trunk contents puncturing the fuel tank. Cischke confirmed her belief that any danger from trunk contents was limited to police vehicles due to their increased exposure to high-speed rear-end collisions. Since the Jablonski accident was the first such occurrence reported to Ford in a non-police vehicle, Ford had no basis upon which to believe that a warning was necessary for civilian users. Further, Cischke testified that, even if she had known of the Jablonski accident, she would not have warned civilian users based upon a single occurrence.

17

Cischke agreed that engineering safety standards require a manufacturer to first attempt to design a hazard out of a product and, if that is not possible, to shield or guard against the hazard and, if the hazard cannot be shielded, to then warn the consumer about the hazard. In her opinion, however, there was no foreseeable risk of trunk contents puncturing the fuel tank in Panther platform civilian vehicles and no safety hazard that required design consideration or warnings.

Ford called Dr. Paul Taylor as an expert witness. Taylor is a mechanical engineer employed by Exponent Failure Analysis Associates, a nationwide firm involved in analyzing accidents. He is experienced in investigating accidents and in statistical analysis. Taylor disagreed with the similar-incident analysis of Mark Arndt and expressed the opinion that nothing in Arndt's lists of prior similar incidents provides proof that the 1993 Lincoln Town Car was unreasonably dangerous. Taylor analyzed the frequency of fatal rear-end collisions involving postcrash fires by comparing the number of vehicles involved in those incidents to the total number of vehicles of that type manufactured. Millions of 1993 Lincoln Town Cars were sold. According to Taylor, the number of 1993 Lincoln Town Cars involved in fatal rear-end collisions involving postcrash fires is only .0009% of the total number of those vehicles sold. In other words, 99.9991% of 1993 Lincoln Town Cars were not involved in that type of fatal collision. In Taylor's opinion, these statistics show that the 1993 Lincoln Town Car is not an unreasonably dangerous vehicle.

Finally, Dr. Edward Caulfield, president of Packer Engineering, testified for Ford as an expert witness. Caulfield is a consultant in accident investigation. At Ford's request, he studied the strength of the frame on Panther platform vehicles, evaluated the cause of the Jablonski accident, and considered whether a guard would have prevented the accident. First, it was his opinion that the strength of the frame was appropriate, that placing the fuel tank within the frame was a good design, and that the design of the tank location was safe.

Second, he concluded that the pipe wrench puncturing the fuel tank was such a rare, unique, and unforeseeable event that a design engineer could not be expected to anticipate and design against such an occurrence. Third, after extensive testing to determine whether adding shields to the fuel tank would have prevented the postcrash fire in this case, it was his conclusion that there is no feasible alternative guarding design which would have prevented the pipe wrench from piercing the tank. Finally, in his opinion, the 1993 Lincoln Town Car has a reasonably safe design and Ford's engineers were not negligent in adopting that design.

At the conclusion of all the evidence, the plaintiffs dismissed their claims for strict product liability and proceeded only on their negligence and willful-and-wanton-conduct counts. The trial court conducted a conference on jury instructions at which Ford objected to various instructions that were given by the court and submitted instructions that were refused. We will discuss those rulings in more detail below. After closing arguments, the case was submitted to the jury, which rendered verdicts in excess of $5 million for the injuries and death of John Jablonski, Sr., in excess of $23 million for the injuries of Dora Jablonski, and $15 million in punitive damages for Dora Jablonski. Ford's posttrial motion for a judgment notwithstanding the verdict or for a new trial was denied, and this appeal followed.

ANALYSIS

We begin by recognizing that the plaintiffs' compensatory-damages claims were submitted to the jury on a negligent-design theory. "Illinois cases considering a cause of action for defective products liability sounding in negligence rather than strict liability are rare, probably because it appears to plaintiffs that it is easier to prove the strict liability count." *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 95, 828 N.E.2d 1128, 1141 (2005). Thus, we must first acknowledge the framework upon which the issues in this case must be analyzed.

To establish a product liability action asserting a claim based upon negligent product design, the plaintiff must establish, as in other negligence cases, "the existence of a duty of care owed by the defendant, a breach of that duty, an injury that was proximately caused by that breach, and damages." *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 270, 864 N.E.2d 249, 263 (2007). "The key distinction between a negligence claim and a strict liability claim lies in the concept of fault." *Calles*, 224 Ill. 2d at 270, 864 N.E.2d at 263. A strict liability claim is concerned only with the condition of the product, while "in a negligence claim, a defendant's fault is at issue in addition to the condition of the product." *Calles*, 224 Ill. 2d at 270, 864 N.E.2d at 263-64. Thus, in both types of cases alleging a product-design claim, the plaintiff must prove the existence of a defective condition in the product at the time it left the manufacturer's control. *Carrizales v. Rheem Manufacturing Co.*, 226 Ill. App. 3d 20, 36, 589 N.E.2d 569, 580 (1991). In a negligent-product-design claim, the plaintiff must also provide evidence of "a standard of care by which to measure a defendant's design and establish a deviation from that standard." *Blue*, 215 Ill. 2d at 96, 828 N.E.2d at 1141.

"A manufacturer is held to the degree of knowledge and skill of experts" (*Anderson v. Hyster Co.*, 74 Ill. 2d 364, 368, 385 N.E.2d 690, 692 (1979)) and "has a nondelegable duty to design reasonably safe products." *Calles*, 224 Ill. 2d at 270, 864 N.E.2d at 264. An automobile manufacturer has a duty " 'to use reasonable care in the design and manufacture of its product, bearing in mind that the intended and actual use of automobiles results in collisions.' " *Mack v. Ford Motor Co.*, 283 Ill. App. 3d 52, 56, 669 N.E.2d 608, 612 (1996) (quoting *Buehler v. Whalen*, 70 Ill. 2d 51, 61, 374 N.E.2d 460, 464-65 (1977)). "The crucial question in a negligent-design case is whether the manufacturer exercised reasonable care in the design of the product." *Calles*, 224 Ill. 2d at 270, 864 N.E.2d at 264. "In determining whether the manufacturer's conduct was reasonable, the question is 'whether in the exercise of ordinary care the manufacturer should have foreseen that the design would be hazardous

20

to someone.' " *Calles*, 224 Ill. 2d at 271, 864 N.E.2d at 264 (quoting American Law of Products Liability 3d §28:48, at 28-66 (1997)). "To show that the manufacturer acted unreasonably based on the foreseeability of harm, the plaintiff must show the manufacturer knew or should have known of the risk posed by the product design at the time of manufacture." *Calles*, 224 Ill. 2d at 271, 864 N.E.2d at 264.

A.

Negligence Claims

Ford first argues that the circuit court erred by not granting it a judgment notwithstanding the verdict because the plaintiffs failed to present sufficient evidence to justify submitting any of their negligence claims to the jury. Our review of the trial court's decision on a motion for a judgment notwithstanding the verdict is *de novo*. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999). A judgment notwithstanding the verdict is not properly entered unless the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 109, 679 N.E.2d 1202, 1208 (1997). If "reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented," then a judgment notwithstanding the verdict should not be entered. *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351, 654 N.E.2d 1365, 1374 (1995). Neither a trial court nor a court of review is allowed to reweigh the evidence or "substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53, 603 N.E.2d 508, 512 (1992).

In this case, the trial court submitted four claims of negligence for the jury's consideration. The jury was instructed as follows:

"[The plaintiffs] claims *** that [Ford] was negligent in one or more of the following

21

respects:

Equipping the 1993 Lincoln Town Car with a vertical-behind-the-axle fuel tank without adding shields or guards; or

Failing to locate the fuel tank above the axle or forward of the rear axle; or

Failing to warn of the risk of trunk contents puncturing the fuel tank; or

Failing to inform of the existence of the Trunk Pack and/or Trunk Pack Recommendations."

The jury entered a general verdict for the plaintiffs. Neither party submitted special interrogatories designed to determine upon which claim or claims of negligence the jury based its verdict. We will first examine Ford's argument that the first three claims of negligence should not have been submitted to the jury. The fourth claim requires a separate analysis.

1.

Claims of Negligent Location of Fuel Tank, Failure to Guard, and Failure to Warn

Ford first argues that the plaintiffs failed to establish that it breached any recognized standard of care in the design of the fuel tank system in the 1993 Lincoln Town Car. As a result, Ford concludes that the trial court erred in submitting the plaintiffs' claims that Ford was negligent in locating the fuel tank, in failing to include guards, and in failing to warn that the fuel tank could be breached by trunk contents. Ford argues that the plaintiffs "made no attempt" to show that the location of the fuel tank behind and not above or forward of the rear axle "violated any standard of care recognized in the industry or by any governmental agency" and that the evidence was "uncontroverted that Ford complied with applicable industry and governmental standards of care." In support of this argument, Ford cites *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 828 N.E.2d 1128 (2005).

In *Blue*, the plaintiff was injured when he used his foot to push a box into a

commercial trash compactor while it was running. *Blue*, 215 Ill. 2d at 83, 828 N.E.2d at 1134. A consulting engineer testified for the plaintiff that the machine could have been made safe by incorporating certain safety features that were technologically available when the machine was manufactured, but he offered no testimony about the industry standard. *Blue*, 215 Ill. 2d at 83-84, 828 N.E.2d at 1134. The majority opinion in *Blue* noted that a product suffers from a design defect when it "conforms to the intended design but the intended design itself, or its sale without adequate instructions or warnings, renders the product not reasonably safe." *Blue*, 215 Ill. 2d at 89-90, 828 N.E.2d at 1137 (citing Restatement (Third) of Torts: Products Liability §1, Comment *a*, at 6 (1998)). In *Blue*, the court cited with approval the appellate court opinions in *Baltus v. Weaver Division of Kidde & Co.*, 199 Ill. App. 3d 821, 557 N.E.2d 580 (1990), and *Carrizales v. Rheem Manufacturing Co.*, 226 Ill. App. 3d 20, 589 N.E.2d 569 (1991), and stated as follows:

"[A] plaintiff raising a negligence claim must do more than simply allege a better design for the product; he must plead and prove evidence of a standard of care by which to measure a defendant's design and establish a deviation from that standard. [Citations.] Thus, to establish a negligence claim for a defective design of a product, a plaintiff must prove that either (1) the defendant deviated from the standard of care that other manufacturers in the industry followed at the time the product was designed[] or (2) that [*sic*] the defendant knew or should have known, in the exercise of ordinary care, that the product was unreasonably dangerous and defendant failed to warn of its dangerous propensity." *Blue*, 215 Ill. 2d at 96, 828 N.E.2d at 1141.

In *dicta*, the *Blue* majority opinion noted that since the plaintiff offered no evidence of an industry standard or its breach, the plaintiff likely failed to prove his negligent-product-design claim, although that issue was not raised by the defendant. *Blue*, 215 Ill. 2d at 100, 828 N.E.2d at 1143.

23

We note that the precedential effect of *Blue* has been called into question. The *Blue* court described the issue before it as whether "the risk-utility analysis normally used in strict products liability cases is applicable to defective product design cases involving only a negligence theory of recovery." *Blue*, 215 Ill. 2d at 81, 828 N.E.2d at 1133. Based upon the court's analysis of *Baltus* and *Carrizales*, that question was answered in the negative. *Blue*, 215 Ill. 2d at 97, 828 N.E.2d at 1142. In *Calles*, however, the supreme court found that the appellate court erred in following the holding in *Blue* that the risk-utility test does not apply to negligent-product-design claims. *Calles*, 224 Ill. 2d at 269-70, 864 N.E.2d at 263. As the court noted:

"There was no majority opinion in *Blue* holding that the risk-utility test was not applicable to negligent-product-design cases. Rather, as Justice Freeman pointed out, only three Justices (Thomas, Garman, and Kilbride) concurred in this conclusion. [Citation.] As such, the conclusion that the risk-utility test is not applicable in negligent-product-design cases is not binding precedent. Accordingly, we conclude that the appellate court erred in reversing summary judgment based on *Blue* and we must review anew the trial court's order that Scripto owed no duty, nor breached any duty owed." *Calles*, 224 Ill. 2d at 269-70, 864 N.E.2d at 263.

The court in *Calles* then proceeded to analyze the plaintiff's negligence claim without reference to the *Blue* court's requirement that the plaintiff establish a standard of care in the industry and a deviation from that standard. Rather, the court in *Calles* stated as follows:

"The crucial question in a negligent-design case is whether the manufacturer exercised reasonable care in the design of the product. [Citations.]

In determining whether the manufacturer's conduct was reasonable, the question is 'whether in the exercise of ordinary care the manufacturer should have foreseen that the design would be hazardous to someone.' [Citations.] To show that

24

the manufacturer acted unreasonably based on the foreseeability of harm, the plaintiff must show the manufacturer knew or should have known of the risk posed by the product design at the time of manufacture." *Calles*, 224 Ill. 2d at 270-71, 864 N.E.2d at 264.

Since we believe that the plaintiffs in this case produced sufficient evidence for this case to be submitted to the jury under either *Blue* or *Calles*, the outcome in this case is not affected by these differences.

In *Baltus*, a mechanic, who was injured when a transmission he was working on slipped off a transmission jack and injured his hand, sued the manufacturer of the transmission jack on a negligent-design theory. *Baltus*, 199 Ill. App. 3d at 824, 557 N.E.2d at 582. The plaintiff in *Baltus* alleged generally that the manufacturer negligently failed to design the transmission jack with appropriate safety guards and safety devices, but he had no expert testimony to support his claims. *Baltus*, 199 Ill. App. 3d at 824-25, 557 N.E.2d at 582. The manufacturer presented the testimony of a registered professional engineer that the transmission jack was in a reasonably safe condition when it left the manufacturer's control and that it was manufactured and designed in a reasonably safe manner. *Baltus*, 199 Ill. App. 3d at 825, 557 N.E.2d at 583. In affirming the circuit court's grant of a summary judgment to the defendant, the *Baltus* court compared negligent-product-design cases to medical malpractice cases and held that these cases generally require both expert testimony and proof of a standard of care against which the manufacturer's design can be judged. *Baltus*, 199 Ill. App. 3d at 836, 557 N.E.2d at 589. Because the plaintiff produced no evidence of reasonable and feasible alternative designs in the industry and because his claim of negligent design was based solely upon his opinion, the evidentiary basis of his claim was insufficient to withstand a summary judgment. *Baltus*, 199 Ill. App. 3d at 829-30, 557 N.E.2d at 585.

In *Carrizales*, the plaintiff was injured "when flammable vapors from his gasoline-soaked clothing were ignited by the flame of a gas-fired hot water heater." *Carrizales*, 226 Ill. App. 3d at 23, 589 N.E.2d at 571-72. The plaintiff's negligent-product-design claim was dismissed by the trial court. *Carrizales*, 226 Ill. App. 3d at 23, 589 N.E.2d at 572. On appeal, the court reversed the dismissal of the plaintiff's failure-to-warn claim, but it affirmed the dismissal of the negligent-product-design claim, stating as follows:

> "Plaintiff in this case failed to plead facts alleging that other manufacturers designed heaters with any of the alternative safety features or designs that plaintiff set out in his complaint. Because plaintiff does not establish a standard of care by which to measure defendant's design, it cannot be determined by the pleadings whether defendant negligently manufactured a defective product because it did not conform to such a standard. In a complex products liability case such as this, we may not find defendant negligently designed the heater by simply relying on plaintiff's opinion." *Carrizales*, 226 Ill. App. 3d at 37, 589 N.E.2d at 581.

Ford asserts that plaintiffs failed to prove a standard of care and a deviation from that standard. We disagree. This is not a case like *Blue*, *Baltus*, or *Carrizales* where the plaintiff failed to present expert testimony or any evidence of feasible alternative designs used by other manufacturers in the industry. Here, the plaintiffs presented ample evidence of a standard of care to support their negligent-product-design claims.

The plaintiffs' expert, Mark Arndt, and virtually every engineer who testified for Ford agreed to the general engineering standard of care in the design of complex products, and each witness stated that standard in nearly identical terms. Once a design engineer identifies a potential hazard in a product, he is obligated to attempt to design the hazard out of the product. If he is unable to do so, he should design a shield or guard to eliminate the hazard. If that is impossible, he should warn the consumer about the hazard. Not only did all the

26

engineers who testified on the subject agree that these are the obligations of the design engineer but the evidence revealed that Ford specifically taught these principles to its own design engineers. Proof of this general engineering standard alone has been held sufficient. See *Sobczak v. General Motors Corp.*, 373 Ill. App. 3d 910, 918, 924, 871 N.E.2d 82, 90, 94-95 (2007) (the appellate court reversed the finding of the trial court that the plaintiff had failed to prove a standard of care, where the plaintiff's expert testified that the standard of care within the engineering industry is that " 'when you identify a potential hazard that affects the safety to the passengers, you need to guard against that hazard and prevent it from causing some risk or danger to the occupants of the vehicle' ").

In this case, however, the plaintiffs' proof goes much further. The plaintiffs' expert, Mark Arndt, testified that, at the time the 1993 Lincoln Town Car was manufactured, other automobile manufacturers were producing automobiles with the fuel tank located forward of the axle. Arndt expressed the opinion that Ford was negligent in the design of the 1993 Lincoln Town Car in that, at the time it was produced, a safer and more practical location for the fuel tank would have been forward of the axle. Arndt further opined that if Ford chose to locate the fuel tank aft of the axle, it should have designed guards or shields which would have protected the tank from being punctured by component parts of the vehicle and trunk contents and which would have required users of the vehicle to align trunk contents laterally. Specifically, feasible shield designs suggested by Arndt included the very designs Ford adopted in its Upgrade Kit and Trunk Pack in response to concerns by police agencies that officers were being injured and killed when trunk contents punctured fuel tanks in Panther platform police vehicles. Finally, it was Arndt's opinion that Ford should have warned users of the danger of objects in the trunk puncturing the fuel tank. Thus, unlike *Blue*, *Baltus*, or *Carrizales*, the plaintiffs in this case presented expert testimony that the product was defective and evidence of an alternative product design in existence in the

27

industry.

Further, the plaintiffs proved that, as early as the 1960s, Ford's own engineers were aware of the potential dangers of an aft-of-the-axle fuel tank location, including the danger of trunk contents puncturing the tank in a collision. Ford's engineers recommended at that time that future automobiles be designed with the tank located above the axle. Ford's witnesses admitted that, beginning in 1981 with the design of the Ford Escort, every new passenger car designed by Ford has been designed with the fuel tank located forward of the axle. The plaintiffs presented evidence that by 1991 a majority of new passenger cars manufactured had fuel tanks located forward of the axle, and that, at the time of the trial, the Panther platform and the Mustang were the only types of vehicles Ford still manufactured with an aft-of-the-axle fuel tank. Thus, the plaintiffs not only presented evidence of feasible alternative designs existing in the industry but also presented evidence of a clear trend in the industry, including at Ford, to eliminate the aft-of-the-axle fuel tank design.

Finally, we note that it was Ford's own instruction that was given to the jury on negligence and the standard of care. That instruction provided as follows:

> "When I use the word 'negligence' in these instructions, I mean the failure to do something which a reasonably careful manufacturer would do, or the doing of something which a reasonably careful manufacturer would not do, under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful manufacturer would act under those circumstances. That is for you to decide.

> To establish a negligence claim for a defective design of a product, a plaintiff must prove that the defendant deviated *from its own standard* or from the standard of care in the industry when the product was designed. That means it was the duty of the defendant to use ordinary care for the safety of plaintiffs with respect to the

28

design of the 1993 Lincoln Town Car.

>When I use the words 'ordinary care', I mean the care a reasonably careful manufacturer would use under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful manufacturer would act under those circumstances. That is for you to decide." (Emphasis added.)

Thus, the jury was instructed, at Ford's request, that it is sufficient proof of negligence if the defendant deviated from its own standard of care. The evidence was clear at the trial that Ford's preferred design after 1981 was for the fuel tank to be located forward of the axle. Ford can hardly complain if the jury was instructed, at its request, that it was sufficient for the plaintiffs to prove that Ford deviated from its own standard of care in the design of the 1993 Lincoln Town Car.

We believe that the plaintiffs presented sufficient evidence on the standard of care to justify the submission of their first three claims of negligence to the jury. By far, the primary focus of the evidence in this case was upon the issue of the appropriate location of the fuel tank. The plaintiffs presented extensive evidence of alternative fuel tank locations recognized and used in the automobile industry, including at Ford. The evidence revealed that Ford's engineers were well aware of the danger of an aft-of-the-axle fuel tank being punctured in a rear-end collision, including by trunk contents, long before the manufacture of the 1993 Lincoln Town Car. The plaintiffs alleged that Ford should have either moved the fuel tank to a safer location or provided a guard or shield to prevent a puncture of the fuel tank by component parts of the vehicle or trunk contents or warned consumers about the danger of trunk contents puncturing the fuel tank. There was ample evidence on the standard of care to justify the submission of these claims to the jury, and the trial court did not err in denying Ford's motion for a judgment notwithstanding the verdict on that basis.

We note that Ford also argues that the plaintiffs failed to offer any evidence on the

29

issue of proximate cause with respect to the failure-to-guard and failure-to-warn claims. This argument is without merit. Proximate cause is generally a fact question for the jury to determine. *Mack v. Ford Motor Co.*, 283 Ill. App. 3d 52, 57, 669 N.E.2d 608, 612 (1996). Evidence presented by the plaintiffs revealed that Ford conducted crash testing of Panther vehicles at 75 miles per hour after the installation of the guards developed for police vehicles, with no penetration of the fuel tank. This evidence alone is sufficient to create a fact question on the issue of whether the failure to provide guards for the fuel tank proximately caused the Jablonskis' injuries. Likewise, there was ample evidence that loading tools and other items into the trunk in a lateral position reduces the likelihood of those items puncturing the fuel tank in a high-speed rear-end collision. No warning to that effect was given, and we believe a fact question existed about whether that failure to warn was a proximate cause of the Jablonskis' injuries.

We have carefully reviewed the record in this case, and we believe that the plaintiffs' claims of negligence based upon the location of the fuel tank, the failure to guard the fuel tank, and the failure to warn of the danger of trunk contents penetrating the fuel tank were properly submitted to the jury. The plaintiffs supported those claims with evidence from which reasonable jurors could conclude that Ford was negligent. Likewise, Ford defended those claims with the testimony of experts that the fuel system in the 1993 Lincoln Town Car was not defective, that it was not negligently designed, and that it met all the industry and government safety standards. The jury heard conflicting evidence and determined the facts based upon that evidence.

2.

Failure to Inform of Trunk Pack and Trunk Pack Recommendations Claim

We next examine separately the plaintiffs' fourth claim of negligence that was submitted to the jury. That claim alleged that Ford was negligent in "[f]ailing to inform of

30

the existence of the Trunk Pack and/or Trunk Pack Recommendations." Ford attacks the submission of this claim to the jury on several fronts. First, Ford argues that there is no postsale duty to warn in Illinois and that, since the evidence is clear that the Trunk Pack and Trunk Pack Recommendations did not exist until long after the manufacture of the 1993 Lincoln Town Car, the trial court submitted a claim which is not recognized under Illinois law. Second, Ford argues that no postsale-duty-to-warn claim was pleaded until after the trial and that it was prejudiced by the allowance of late amendments to include this claim. Finally, Ford argues that even if this claim was recognized under Illinois law, it should not have been submitted to the jury because the plaintiffs failed to prove that Ford breached a recognized standard of care or that the postsale failure to warn caused their injuries. Ford asserts that the submission of this claim entitles it to a new trial.

The plaintiffs counter that any error in submitting this claim was cured by the entry of a general verdict. The plaintiffs argue, however, that the submission of this claim was not error in that, under Illinois law, a manufacturer who has a duty to warn at the time a product leaves its control has a continuing duty to warn of that defect. The plaintiffs further assert that Ford was well aware, in advance of the trial, of the plaintiffs' claims based upon Ford's failure to warn consumers about the Trunk Pack and Trunk Pack Recommendations and cannot claim surprise and prejudice in the submission of this claim. Finally, the plaintiffs argue that sufficient evidence was presented for the submission of this claim to the jury.

a.

General Verdict

We begin our analysis of this issue by examining whether the return of a general verdict cures any error in the submission of the fourth claim. The plaintiffs claim that section 2-1201(d) of the Code of Civil Procedure (735 ILCS 5/2-1201(d) (West 2004)) governs this issue. That section provides as follows:

31

"(d) If several grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict; nor shall the verdict be set aside or reversed for the reason that the evidence in support of any ground is insufficient to sustain a recovery thereon, unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial." 735 ILCS 5/2-1201(d) (West 2004).

The plaintiffs focus upon the first portion of the statute providing that a general verdict shall not be set aside or reversed if any one of several grounds is sufficient to sustain the verdict. The plaintiffs argue that their continuing-duty-to-warn claim was properly presented to the jury but that even if the trial court erred in submitting that claim, any error was cured by the entry of a general verdict, since the plaintiffs' other three claims of negligence were properly submitted and it is impossible to determine upon which of the claims the jury based its verdict. Ford focuses upon the latter part of the statute, points out that it did request that all four claims of negligence be withdrawn from the jury, and argues that even if the other three claims of negligence were properly submitted to the jury, the submission of the plaintiffs' "unsupported, unpleaded[,] and unrecognized" postsale-duty-to-warn claim was prejudicial, entitling Ford to a new trial. We agree with the plaintiffs.

It has long been the rule in Illinois that where there is a general verdict and several claims are presented, the verdict will be upheld against a challenge that a claim is defective, if there is sufficient evidence for any one or more claims, and the defendant cannot claim prejudice if he failed to request separate verdicts or special interrogatories to determine upon which claims the jury found for the plaintiff. *Moore v. Jewel Tea Co.*, 46 Ill. 2d 288, 294,

32

263 N.E.2d 103, 106 (1970) ("It is settled law that where several causes of actions are charged and a general verdict results, the verdict will be sustained if there are one or more good causes of action or counts to support it," and the defendants, having failed "to ascertain upon which count or counts the jury returned its verdicts *** by submitting a separate form of verdict as to each count" "cannot complain or seek to take advantage of their failure"); *Witherell v. Weimer*, 118 Ill. 2d 321, 329, 515 N.E.2d 68, 72 (1987) ("When there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the defendant, having failed to request special interrogatories, cannot complain"); *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 492, 771 N.E.2d 357, 363 (2002) (in a medical malpractice action where the defendants claimed prejudice in the untimely assertion of an additional claim of negligence that was submitted to the jury, the supreme court refused to set aside a general verdict, which was supported by sufficient evidence on other theories, where the defendants failed to request special interrogatories and there was therefore "no way of knowing on what theory the jury found defendants negligent").

The rule sustaining a general verdict if it is supported by one or more good theories has been applied equally to defense verdicts. *Krklus v. Stanley*, 359 Ill. App. 3d 471, 479, 833 N.E.2d 952, 959-60 (2005) (in a medical malpractice action where the plaintiff complained that the issue of contributory negligence should not have been submitted to the jury, a general verdict for the defendants was sustained where the verdict could be based either on a finding that the defendants were not negligent or on a finding that the plaintiff's contributory negligence was more than 50% of the total fault and where the plaintiff failed to submit special interrogatories to determine the basis of the jury's findings); *Orzel v. Szewczyk*, 391 Ill. App. 3d 283, 290, 908 N.E.2d 569, 575 (2009) (in a legal malpractice action, a general verdict for the defendants was sustained against a claim of prejudice in

submitting a claim of contributory negligence where the verdict could have been based upon a finding that the plaintiff failed to prove negligence and where the plaintiff did not submit special interrogatories).

The court in *Foley v. Fletcher*, 361 Ill. App. 3d 39, 836 N.E.2d 667 (2005), provided an excellent explanation of the general-verdict rule. *Foley* was a medical malpractice case in which the jury was instructed upon four possible theories of negligence. The jury returned a general verdict for the plaintiffs, and neither side requested special interrogatories to determine upon which theories the jury found the defendants negligent. The defendants claimed prejudice in the submission of the fourth theory, arguing that it was based upon an expert opinion allowed in violation of Supreme Court Rule 213 (210 Ill. 2d R. 213). Because of its application to this case, we quote extensively from the *Foley* opinion:

"Plaintiffs claim there was enough evidence to support the jury's verdict under theories, 'a,' 'b[,]' and 'c,' so even if theory 'd' was tainted by a Rule 213 violation, reversal would not be necessary. Plaintiffs contend that one defective theory of liability will not disturb a general verdict where there was sufficient evidence to sustain the other theories. ***

***

Defendants contend section 2-1201(d) notwithstanding, the entire verdict must be set aside here because the facts conform to an exception to the general rule that one defective ground is not enough to defeat a verdict. Defendants focus on the clause, 'unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial.' [Citation.] Defendants allege that the criteria in the exception were met because: (1) defendants moved to withdraw theory 'd' before the case was submitted to the jury; (2) their basis for the motion was [an

34

opinion witness's] improperly admitted and therefore insufficient evidence; (3) the trial court then denied their motion; and (4) the denial resulted in prejudice to defendants.

But defendants are unable to show prejudice because they cannot show that the jury based its verdict on the instruction at issue. Neither side requested special interrogatories under section 2-1108 of the Code. [Citation.] A defendant cannot expect recourse where a plaintiff presents more than one theory of her case, the defendant does not request special interrogatories[,] and the jury returns a general verdict. [Citations.] Nor can it be presumed that reversal is warranted because the jury was misled by the court's instruction unless there is some indication that the jury was improperly influenced. [Citation.] Without the jury's answer to a special interrogatory on theory 'd,' we could not conclude that defendants were prejudiced even if [the opinion witness's] testimony was admitted in error." *Foley*, 361 Ill. App. 3d at 49-50, 836 N.E.2d at 676.

The pertinent facts in this case are almost identical to those in *Foley*. The plaintiffs presented four theories of negligence. We have already determined that the first three theories were properly submitted; therefore, only the fourth theory remains in question. Ford moved to withdraw the fourth theory before the case was submitted to the jury, arguing that the evidence supporting that theory was improperly admitted. The trial court denied Ford's motion and submitted the fourth theory. Ford now claims prejudice resulting from the submission of the fourth theory, entitling it to a new trial.

As in *Foley*, Ford cannot claim prejudice, because it failed to submit special interrogatories from which the basis of the jury's finding of negligence could be determined.[2]

---

[2]Although Ford appeals the trial court's refusal to submit certain special interrogatories that were tendered, and those arguments will be determined later in this opinion, those

Since Ford submitted no special interrogatories to determine whether the jury relied upon the plaintiffs' fourth theory of negligence–"[f]ailing to inform of the existence of the Trunk Pack and/or Trunk Pack Recommendations," we have no way of determining whether that theory played any role in the jury's decision. On the record before us, the jury might have based its decision entirely upon one or more of the plaintiffs' other claims of negligence, without considering the fourth claim at all. Since Ford failed to submit special interrogatories to determine this issue, it cannot now claim prejudice. Consequently, even if the plaintiffs' fourth claim of negligence was improperly submitted and was based upon inadmissible evidence, we must sustain the general verdict.

b.

Continuing Duty to Warn

Regardless of the foregoing, we find no error in the submission of the plaintiffs' fourth claim of negligence. "The decision to give or deny an instruction is within the trial court's discretion. The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law." *Dillon*, 199 Ill. 2d at 505, 771 N.E.2d at 371. We do not believe that the trial court abused its discretion in instructing the jury on the plaintiffs' fourth claim of negligence.

The parties correctly discuss this issue under a failure-to-warn analysis. The instruction in question only asserts that Ford was negligent in "[f]ailing to inform" about the "Trunk Pack and/or Trunk Pack Recommendations." No claim is made that Ford had a duty to retrofit the Jablonskis' 1993 Lincoln Town Car with the Trunk Pack. Ford argues that there is no postsale duty to warn under Illinois law. Although the plaintiffs urge us to adopt

special interrogatories were not designed to determine upon which claims the jury based its verdict.

36

that rule, they agree that Illinois law does not generally impose upon a manufacturer a postsale duty to warn of hazards first discovered after a product has left its control. They argue, however, that if a manufacturer knew or should have known of the hazard at the time of manufacture, so that a duty to warn existed when the product left its control, that duty to warn is continuous. Thus, the plaintiffs argue, if a manufacturer later develops safety features or safety information for the purpose of protecting consumers from a hazard of which it had knowledge at the time the product was originally sold, it has a duty to use reasonable care to inform users of the product of the existence of those safety features and information. We agree with the plaintiffs.

First, it is incorrect to state that no Illinois case has imposed a postsale duty to warn of hazards discovered after a product is sold, because that duty has been clearly imposed for pharmaceutical products. A drug manufacturer has a " '*continuous duty \*\*\** to warn physicians of the dangers incident to prescribing the drug, to keep abreast of scientific developments touching upon the manufacturer's product[,] and *to notify the medical profession of any additional side effects discovered from its use*.' " (Emphasis in original.) *Proctor v. Davis*, 291 Ill. App. 3d 265, 278, 682 N.E.2d 1203, 1211 (1997) (quoting *Schenebeck v. Sterling Drug, Inc.*, 423 F.2d 919, 922 (8th Cir. 1970)). The need to impose a continuing duty to warn upon a pharmaceutical manufacturer is evident. Illinois cases involving other products and analyzing whether a manufacturer has a postsale duty to warn decline to impose that duty, unless the manufacturer knew or should have known of the hazard at the time the product was manufactured.

Likewise, the cases cited by Ford decline to impose a postsale duty to warn of a hazard discovered after manufacture but suggest that a continuous duty to warn exists if the manufacturer knew or should have known of the hazard when the product left its control. In *Collins v. Hyster Co.*, 174 Ill. App. 3d 972, 529 N.E.2d 303 (1988), the plaintiff was

injured on a forklift. The trial court struck certain allegations of negligence based upon a continuing duty to warn. The specific allegations are not detailed in the opinion. The court stated as follows:

"[T]he trial court's ruling is correct in that we have not discovered any authority in Illinois for extending the duty to warn beyond the time when the product left the manufacturer's control *unless Hyster knew or should have known at that time that the product was defective.* Here, there is no evidence that Hyster should have known the product was defective at the time it left Hyster's control of which it would have had a continuing duty to warn against in the event the hazard was discovered subsequent to the time it left the manufacturer's control. Certainly the law does not contemplate placing the onerous duty on manufacturers to subsequently warn all foreseeable users of products based on increased design or manufacture expertise that was not present at the time the product left its control." (Emphasis added.) *Collins*, 174 Ill. App. 3d at 977, 529 N.E.2d at 306.

Thus, in *Collins*, the court declined to impose a postsale duty to warn, but that ruling was not applied to circumstances in which the manufacturer knew that the product was defective when it left its control.

In *Kempes v. Dunlop Tire & Rubber Corp.*, 192 Ill. App. 3d 209, 548 N.E.2d 644 (1989), a child was injured when he cut into a golf ball and the paste center squirted into his right eye. There was no evidence in the record from which it could be determined that the manufacturer knew or should have known of the existence of that danger at the time the golf ball was manufactured. The court stated, " '[T]o hold a manufacturer liable for failure to know of a danger of which it would be impossible to know based on the *present* state of human knowledge would make the manufacturer a virtual insurer of the product ***.' " (Emphasis in original.) *Kempes*, 192 Ill. App. 3d at 218, 548 N.E.2d at 649 (quoting *Woodill*

38

*v. Parke Davis & Co.*, 79 Ill. 2d 26, 37, 402 N.E.2d 194, 199 (1980)). Then the court simply asserted that there is no duty to warn beyond the time a product leaves the manufacturer's control " 'unless it knew or should have known at that time that the product was defective.' " *Kempes*, 192 Ill. App. 3d at 218, 548 N.E.2d at 649 (quoting *Collins*, 174 Ill. App. 3d at 977, 529 N.E.2d at 306). Again, nothing in *Kempes* suggests that a postsale, continuing duty to warn would not be imposed upon a manufacturer who knew or should have known of the hazard when the product left its control.

Finally, in *Modelski v. Navistar International Transportation Corp.*, 302 Ill. App. 3d 879, 707 N.E.2d 239 (1999), the plaintiff alleged that the plaintiff's decedent was injured and died as a result of the negligent design of the seat assembly on a Farmall tractor manufactured by the defendant. The plaintiff alleged, in part, that the defendant Navistar International Transportation Corp. was negligent in failing to provide postsale warnings to foreseeable users after learning of the hazard presented by the seat assembly and in failing to retrofit the seat assembly postsale to eliminate the hazard. Those allegations were stricken by the trial court, and a judgment was entered upon a jury verdict for the defendant.

The court in *Modelski* made a clear distinction between a duty to warn of hazards of which the manufacturer had knowledge at the time the product was manufactured and those of which there was no such knowledge. It is clear that it was the latter which was at issue in *Modelski*, because the court described the claims of the parties as follows:

> "In this case, Navistar argues that it was under no legally recognized duty to warn foreseeable users of any dangers associated with the use of its Farmall Model 450 tractor of which it was not aware, nor should it have been, when the tractor left its control. The plaintiff contends that the manufacturer of a product is under a continuing duty to warn of hazards associated with the use of its products, even those hazards discovered post[]sale." *Modelski*, 302 Ill. App. 3d at 887, 707 N.E.2d at 246.

39

On the precise question presented, the court declined to extend the duty to warn postsale to hazards first discovered after the product left the manufacturer's control. With regard to hazards of which the manufacturer knew or should have known at the time the product was manufactured, however, the court held as follows:

"A manufacturer, reasonably aware of a dangerous propensity of its product, has a duty to warn foreseeable users where there is unequal knowledge, actual or constructive, and it knows or should know that harm might or could occur if no warning is given. Failure to warn under such circumstances can expose the manufacturer to liability for negligence. [Citation.] Manufacturers are charged with the knowledge of experts. [Citation.] Given that presumed degree of knowledge, a manufacturer's subjective understanding of the dangers associated with the use of its products, while relevant, is not determinative of its obligation to warn. Rather, it is sufficient to impose a duty to warn if an expert in the field would have known of the product's dangerous propensity and foreseen injury in the absence of a warning. *Under such circumstance, the duty to warn may well be continuous.*" (Emphasis added.) *Modelski*, 302 Ill. App. 3d at 887-88, 707 N.E.2d at 246.

As the above analysis indicates, the cases cited by Ford stand for the proposition that a manufacturer has no duty in Illinois to provide a postsale warning when the manufacturer had no reason to know of the hazard when the product left its control. The same cases, however, impose a continuing duty to warn of hazards of which a manufacturer knew or should have known at the time the product was manufactured. We believe that this is a commonsense rule. It would make no sense for a duty to warn, which already exists, to disappear after a hazardous product leaves the control of the manufacturer. Sound public policy requires that a manufacturer be held to a continuing duty to warn of a hazard and to notify consumers of its product if the hazard can be avoided. We hold that a manufacturer

40

has a continuing duty to warn of a hazard of which it had a duty to warn at the time the product was manufactured, including using reasonable care to inform foreseeable users of product developments designed to eliminate the hazard.

The plaintiffs urge us to go further and adopt a postsale duty to warn of hazards first discovered after a product leaves the control of a manufacturer. We note the growing list of jurisdictions which have recognized that duty.[3] We are specifically urged to adopt section 10 of the Restatement (Third) of Torts: Products Liability (Restatement (Third) of Torts: Products Liability §10 (1998)).[4] However, in order to decide the issues in this case, we do

---

[3]See, *e.g.*, *Comstock v. General Motors Corp.*, 358 Mich. 163, 99 N.W.2d 627 (1959); *Downing v. Overhead Door Corp.*, 707 P.2d 1027 (Colo. App. 1985); *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826 (Minn. 1988); *Smith v. Selco Products, Inc.*, 96 N.C. App. 151, 385 S.E.2d 173 (1989); *Patton v. Hutchinson Wil-Rich Manufacturing Co.*, 253 Kan. 741, 861 P.2d 1299 (1993); *Dixon v. Jacobsen Manufacturing Co.*, 270 N.J. Super. 569, 637 A.2d 915 (1994); *Crowston v. Goodyear Tire & Rubber Co.*, 521 N.W.2d 401 (N.D. 1994); *United States Gypsum Co. v. Mayor & City Council of Baltimore*, 336 Md. 145, 647 A.2d 405 (1994); *Novak v. Navistar International Transportation Corp.*, 46 F.3d 844 (8th Cir. 1995); *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 700 N.E.2d 303 (1998); *Lovick v. Wil-Rich*, 588 N.W.2d 688 (Iowa 1999); *Watkins v. Ford Motor Co.*, 190 F.3d 1213 (11th Cir. 1999); *Lewis v. Ariens Co.*, 434 Mass. 643, 751 N.E.2d 862 (2001); *Couch v. Astec Industries, Inc.*, 132 N.M. 631, 53 P.3d 398 (2002); *Brown v. Crown Equipment Corp.*, 2008 ME 186, 960 A.2d 1188 (2008).

[4]Section 10 of Restatement (Third) of Torts: Products Liability provides as follows:

"(a) One engaged in the business of selling or otherwise distributing products is subject to liability for harm to persons or property caused by the seller's failure to provide a warning after the time of sale or distribution of a product if a reasonable

41

not need to determine whether Illinois should adopt a postsale duty to warn of hazards not discovered until after a product leaves the manufacturer's control. Therefore, we offer no opinion on that issue.

Here, Ford was well aware of the danger of fuel tanks being punctured by trunk contents in rear-end collisions long before the Jablonskis' 1993 Lincoln Town Car was manufactured. The evidence disclosed that, as early as 1970, Ford's own design engineers were considering the danger from trunk contents in determining the fuel tank location in its automobiles. This hazard was not just foreseeable by Ford; it was, in fact, foreseen. In addition to having actual knowledge of the hazard, Ford was aware that there were a substantial number of accidents before the manufacture of the Jablonskis' automobile in which the fuel tank was ruptured in Ford vehicles. The plaintiffs introduced into evidence a list of 416 such accidents, compiled by Ford in 1992, which revealed 378 fatal burn injuries. Thus, at the time the Jablonski vehicle left Ford's control, Ford knew that serious

---

person in the seller's position would provide such a warning.

(b) A reasonable person in the seller's position would provide a warning after the time of sale if:

(1) the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and

(2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

(3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

(4) the risk of harm is sufficiently great to justify the burden of providing a warning." Restatement (Third) of Torts: Products Liability §10 (1998).

42

and fatal burn injuries were resulting from fuel tank ruptures in automobile collisions and that the trunk's contents could potentially cause such a rupture. As we have already determined, this evidence was sufficient to submit to the jury the issue of whether Ford was negligent in "[f]ailing to warn of the risk of trunk contents puncturing the fuel tank."

Ford's obligation to warn of this hazard was a continuing duty, and after the manufacture of the Jablonski automobile, Ford continued to gain information from which it could reasonably conclude that a warning was necessary. Between 1993 and 2003 Ford became aware of rear-end collisions involving Panther platform Police Interceptors in which police officers were killed or seriously injured when the fuel tanks were punctured by trunk contents or component parts of the automobile. Those accidents prompted complaints by police agencies and an NHTSA investigation. As a consequence, in 2001, Ford issued a TSB to all the Ford dealers to make modifications to Panther vehicles to avoid the puncture of the fuel tanks by component parts. In 2002, as a result of negotiations with the Arizona Attorney General, Ford developed an Upgrade Kit, consisting of shields to prevent punctures by component parts, and a Trunk Pack, which was a drop-in trunk liner designed to prevent fuel tank rupture by trunk contents, to be used in Panther platform Police Interceptor vehicles. In addition, Trunk Packing Considerations were developed that instructed police officers on ways to pack equipment in the trunk, with or without the Trunk Pack, in order to reduce the danger of trunk contents rupturing the fuel tank in high-speed rear-end collisions. Ford determined that the hazard of fuel tank ruptures required that it give postsale warnings to all the registered owners of police vehicles, all the United States Ford, Lincoln and Mercury dealers, and 32,000 government fleet customers.

We believe that the circumstances of this case warranted instructing the jury upon Ford's continuing duty to warn of the danger of trunk contents puncturing the fuel tank. Since Ford specifically developed the Trunk Pack and Trunk Packing Considerations for the

43

purpose of reducing or eliminating that danger, we believe that it was appropriate to allow the jury to determine whether Ford was negligent in failing to inform the plaintiffs of their existence. Further, the trial court did not abuse its discretion in the manner in which it instructed the jury on this issue.

First, the trial court gave Ford's instructions on its duty to warn. Those instructions stated as follows:

> "To establish a negligence claim for a failure to warn, the plaintiff must prove that the defendant knew or should have known, in the exercise of ordinary care, that the product was unreasonably dangerous and defendant failed to warn of its dangerous propensity."

> "The manufacturer has a duty to adequately warn the consumer about the dangers of its product of which it knew, or, in the exercise of ordinary care, should have known, at the time the product left the manufacturer's control."

Ford's instructions accurately stated the law on Ford's duty to warn based upon what it knew or should have known when the 1993 Lincoln Town Car left Ford's control, but they do not limit the jury to warnings given at that time.

The trial court also gave two instructions submitted by the plaintiffs to guide the jury in determining if Ford was negligent in failing to give a postsale warning. These instructions must be read in conjunction with Ford's instructions on the duty to warn. The first instruction was patterned after Section 10 of Restatement (Third) of Torts: Products Liability, and it instructed the jury as follows:

> "One engaged in the business of selling or otherwise distributing products is subject to liability for harm to persons caused by the seller's failure to provide a warning after the time of sale or distribution of a product if a reasonably careful person in the seller's position would provide such a warning under the circumstances.

44

A reasonably careful person in the seller's position would provide a warning after the time of sale if:

The seller knows or reasonably should know that the product poses a substantial risk of harm to persons; and

Those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

A warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

The risk of harm is sufficiently great to justify the burden of providing a warning.

Whether or not Ford Motor Company acted as a reasonably careful person under the circumstances of this case is for you to decide."

The second instruction submitted by the plaintiffs was based upon a voluntary-undertaking theory, and it stated as follows:

"A manufacturer who voluntarily undertakes to provide an after[-]the[-]sale warning to some of its customers may be subject to liability if it does not warn other customers.

Whether the manufacturer's conduct in warning some of its customers and not others was reasonable under the circumstances is for you to decide."

None of the instructions given suggested that Ford was required to warn of hazards it should not have discovered before the 1993 Lincoln Town Car left its control.

"In Illinois, the parties are entitled to have the jury instructed on the issues presented, the principles of law to be applied, and the necessary facts to be proved to support its verdict." *Dillon*, 199 Ill. 2d at 505, 771 N.E.2d at 371. There are no pattern jury instructions describing the circumstances under which a manufacturer may be held liable for failing to

45

give a postsale warning. In situations where pattern instructions are inadequate and additional instructions are appropriate, nonpattern instructions may be given so long as they are "simple, brief, impartial, and nonargumentative." *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 388, 728 N.E.2d 797, 808 (2000); 177 Ill. 2d R. 239(a).

As we have already indicated, we believe that the evidence in this case was sufficient to allow the jury to determine whether Ford was negligent in "[f]ailing to inform of the existence of the Trunk Pack and/or Trunk Pack Recommendations." Under the facts in this case, we believe that the instruction modeled after Section 10 of Restatement (Third) of Torts: Products Liability, was appropriately given to guide the jury in making that determination. Further, since the evidence revealed that Ford made a decision to give a postsale warning to some of its customers, we believe that the voluntary-undertaking instruction was appropriate, under the facts of this case, to guide the jury in determining whether Ford was negligent in failing to warn its other customers. Taken as a whole, the instructions were clear and fairly and accurately stated the law. *Dillon*, 199 Ill. 2d at 505, 771 N.E.2d at 371. Accordingly, we do not believe that the trial court erred in instructing the jury on the issue of postsale warnings.

Ford also argues that it was prejudiced because the trial court allowed the plaintiffs to plead their fourth allegation of negligence based upon a postsale failure to warn in an amended complaint filed after the trial and for the purpose of conforming the pleadings to the proof. Ford cannot claim surprise at the introduction of this evidence. The record reflects that Ford was well aware of the evidence supporting the plaintiffs' postsale-warning claim and filed pretrial motions seeking to exclude that evidence, which were denied. "A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs ***." 735 ILCS 5/2-616(c) (West 2004). Section 2-616(c) of the Code of Civil Procedure (735 ILCS 5/2-616(c) (West 2004)) should be liberally construed, and "[a]ny

46

doubt as to whether pleadings should be amended should be resolved in favor of the amendment." *Deming v. Montgomery*, 180 Ill. App. 3d 527, 533, 536 N.E.2d 150, 154 (1989). We do not believe that the trial court abused its discretion in allowing the amendment.

Finally, Ford argues that the evidence was insufficient to justify submitting the plaintiffs' fourth claim of negligence to the jury. We see no reason to restate the evidence in this regard. The Trunk Pack and Trunk Packing Considerations were specifically developed by Ford to reduce the hazard of the trunk's contents puncturing the fuel tank in Panther platform police vehicles. Ford makes no claim that the use of the Trunk Pack and Trunk Packing Considerations would not perform the same function in other Panther platform vehicles. Rather, Ford simply claims that police vehicles have a greater exposure to the risk of high-speed rear-end collisions and that it was therefore not negligent for failing to inform owners of civilian vehicles of the existence of the Trunk Pack and Trunk Packing Considerations. After a careful review of the record in this case, we believe that the questions of whether Ford was negligent in failing to warn of the danger of trunk contents puncturing the fuel tank and whether it was negligent in failing to inform users of postsale developments designed to reduce that hazard are questions peculiarly appropriate for a jury to decide.

The plaintiffs and Ford were each allowed an adequate opportunity to present evidence on the issues in this case. We find no error in the trial court's submission of the plaintiffs' first three claims of negligence. Any one of those claims is sufficient to support the general verdict in favor of the plaintiffs, and since Ford failed to submit special interrogatories to determine upon which claims of negligence the jury's decision was based, it cannot claim prejudice in the submission of the plaintiffs' fourth claim of negligence based upon a continuing duty to warn. While we would sustain the general verdict even if the

47

continuing-duty-to-warn claim was submitted in error, under the peculiar facts of this case, we find no error in the submission of that claim. Thus, the trial court did not err in denying Ford's motion for a judgment notwithstanding the verdict or for a new trial based upon the submission to the jury of the plaintiffs' four claims of negligence.

B.

Evidentiary Rulings

Ford raises three issues in which it claims that the trial court erred in ruling upon the admission of evidence. Ford argues that it was error for the court to admit any evidence about its preinjury, postsale design efforts to improve Panther platform Police Interceptors, that it was error to admit the plaintiffs' exhibit listing 416 previous accidents as similar incidents, and that the court erred in refusing to allow Ford to introduce evidence that the 1993 Lincoln Town Car complied with the version of FMVSS 301 scheduled to first apply to 2006 model vehicles. "Evidentiary rulings are within the sound discretion of the trial court and will be upheld absent an abuse of discretion that resulted in prejudice to the objecting party." *Stallings v. Black & Decker (U.S.), Inc.*, 342 Ill. App. 3d 676, 683, 796 N.E.2d 143, 149 (2003). "An abuse of discretion occurs when no reasonable person would rule as the circuit court ruled." *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 98, 887 N.E.2d 656, 663 (2008). With these principles in mind, we will consider each of Ford's claims of error.

1.

Panther Platform Police Interceptor Evidence

Ford first challenges the trial court's rulings allowing testimony and exhibits pertaining to its development of additional safety features for the Police Interceptor during the 10-year period after the manufacture of the Jablonski vehicle, but before the accident. Ford specifically argues that the court committed reversible error, requiring a new trial, by

allowing the introduction of evidence of the Upgrade Kit, the TSB that Ford sent to its dealers, the Trunk Pack and Trunk Packing Considerations, and testimony about Ford's activities to improve the safety of the Police Interceptor through the development of those items. The basis of Ford's objection to this evidence is that it violates the rule against the introduction of subsequent remedial measures.

As has been succinctly stated by the supreme court, "Evidence of post[]accident remedial measures is not admissible to prove prior negligence." *Herzog v. Lexington Township*, 167 Ill. 2d 288, 300, 657 N.E.2d 926, 932 (1995). The policy reasons for the rule were described by the *Herzog* court as follows:

> "Several considerations support this general rule. First, a strong public policy favors encouraging improvements to enhance public safety. [Citation.] Second, subsequent remedial measures are not considered sufficiently probative of prior negligence, because later carefulness may simply be an attempt to exercise the highest standard of care. [Citation.] Third is a general concern that a jury may view such conduct as an admission of negligence." *Herzog*, 167 Ill. 2d at 300, 657 N.E.2d at 932.

However, the court further noted, "Although evidence of subsequent remedial measures is not admissible to prove prior negligence, such evidence may be admissible for other purposes." *Herzog*, 167 Ill. 2d at 300, 657 N.E.2d at 932. "Generally, evidence of subsequent remedial measures is not admissible as proof of negligence, although it may be introduced as to feasibility of design." *Carrizales*, 226 Ill. App. 3d at 40, 589 N.E.2d at 583. "Evidence of the feasibility of an alternative design is relevant and material in an action alleging an unreasonably dangerous product under both negligence and strict liability theories." *Stallings*, 342 Ill. App. 3d at 684, 796 N.E.2d at 149.

Analyzing this issue as framed by Ford, we believe that the evidence to which Ford objects falls within the alternative-feasible-design exception to the subsequent-remedial-

49

measures rule. It is clear from the evidence that the Upgrade Kit, the Trunk Pack, and the Trunk Packing Considerations were developed by Ford for the purpose of reducing the risk of the fuel tank being punctured by component parts and trunk contents in high-speed rear-end collisions. This is the very hazard that the plaintiffs alleged was the cause of their injuries. The plaintiffs' expert, Mark Arndt, testified that at the time the 1993 Lincoln Town Car was manufactured, Ford should have located the fuel tank above or forward of the axle, or it should have equipped the vehicle with shields like the Upgrade Kit and the Trunk Pack and should have provided warnings similar to the Trunk Pack Considerations. Ford offered no evidence that these designs were not feasible at the time the Jablonski vehicle left its control. Further, the evidence revealed that, after the incorporation of these design changes, the Police Interceptor passed a 75-mile-per-hour crash test. Thus, it seems clear that this evidence was at least admissible to show that an alternative feasible design was available at the time the 1993 Lincoln Town Car left Ford's control and that it could have prevented the Jablonskis' injuries. On this basis alone, we believe that the trial court did not abuse its discretion in allowing the introduction of this evidence. In order to complete our analysis of the issue of Ford's continuing duty to warn, however, we will also consider the admissibility of the evidence in support of that theory.

We first note that an analysis of the admissibility of the Police Interceptor evidence does not fit squarely within the rule barring the admission of subsequent remedial measures. That rule bars the admission of *postaccident* repairs or design changes that are often a direct result of the accident at issue. Here, the design changes represented by the Upgrade Kit and the Trunk Pack, and all the circumstances surrounding those changes, occurred *before* the Jablonski accident.

The rule barring the admission of subsequent remedial measures is deeply embedded in our jurisprudence. An examination of the historical basis of the rule is helpful to our

analysis. Early cases applying the rule barring the admission of subsequent remedial measures simply held that the issue of negligence must be determined based upon what occurred "before and at the time of the accident." *Grubb v. Illinois Terminal Co.*, 366 Ill. 330, 341, 8 N.E.2d 934, 939 (1937) (in an action involving a railroad crossing accident where the plaintiff sought to introduce evidence that the flasher signal was replaced after the accident, the court held that "the question of negligence is to be determined only from what occurred before and at the time of the accident, and evidence of repairs made after the accident is not admissible"); *Howe v. Medaris*, 183 Ill. 288, 295, 55 N.E. 724, 727 (1899) (in an action by an employee who was injured operating a machine at work who sought to introduce evidence that the machine was repaired after the accident to show an implied admission of negligence, the court held, "The rule in such cases is[,] that the question of negligence should be determined only by what occurred before and at the time of the accident, and evidence of repairs made after the accident is not admissible").

In *Hodges v. Percival*, 132 Ill. 53, 23 N.E. 423 (1890), the plaintiff was injured when an elevator fell in a building owned by the defendant. The defendant claimed error in the admission of testimony that an air-cushion was put in the elevator shaft after the accident. The court found that the admission of this evidence was error, although it did not require a reversal in that case. We quote the supreme court's opinion at length, because its analysis applies with equal force today:

> "Evidence of precautions taken after an accident is apt to be interpreted by a jury as an admission of negligence. The question of negligence should be determined by what occurred before and at the time of the accident, and not by what is done after it. New measures or new devices adopted after an accident do not necessarily imply that all previous devices or measures were insufficient. A person operating a passenger elevator is bound to avail himself of all new inventions and improvements

51

known to him, which will contribute materially to the safety of his passengers, whenever the utility of such improvements has been thoroughly tested and demonstrated, and their adoption is within his power, so as to be reasonably practicable. For this reason it was proper to show that a valuable device for securing safety was known to the defendant, and its use neglected by him, before the accident; but it would seem unjust that he could not take additional precautions after the accident without having his acts construed into an admission of prior negligence. Persons[] to whose negligence accidents may be attributed[] will hesitate about adopting such changes as will prevent the recurrence of similar accidents, if they are thereby to be charged with an admission of their responsibility for the past. The happening of an accident may inspire a party with greater diligence to prevent a repetition of a similar occurrence, but the exercise of such increased diligence ought not necessarily to be regarded as tantamount to a confession of past neglect."

*Hodges*, 132 Ill. at 56-57, 23 N.E. at 424.

Thus, the focus of concern is that a defendant not be punished for postaccident remedial measures. The same concern does not apply to measures of which the defendant was aware and could have implemented before the accident.

The precise issue before this court is not the admissibility of evidence of subsequent remedial measures; rather, the issue is the admissibility of evidence of preinjury, postsale design changes solely on the issue of a failure to warn of those changes. The only Illinois negligent-product-design case to directly address this issue is *Carrizales*. In that case, the plaintiff sought to introduce evidence, on the issue of negligence regarding warnings, that after the manufacture of the water heater, but before the plaintiff's injury, the defendant began putting warning labels on the heaters and developed an 18-inch stand as an option that would allow purchasers to raise the pilot light above floor level. *Carrizales*, 226 Ill. App.

52

3d at 40, 589 N.E.2d at 583. The trial court granted the defendant's motion to exclude the evidence, and the First District Appellate Court affirmed. The court analyzed the issue by analogy to the rule barring evidence of subsequent remedial measures and held that the policy reasons for barring postaccident remedial measures also applied to preinjury measures to improve mass-produced items such as water heaters. In those cases, the court held, "[A]llowing evidence of pre[]injury remedial measures would have a chilling effect on the incentive to improve safety in such widely[]used products." *Carrizales*, 226 Ill. App. 3d at 41, 589 N.E.2d at 584. The reasoning of *Carrizales* has since been followed in strict product liability cases in *Smith v. Black & Decker (U.S.), Inc.*, 272 Ill. App. 3d 451, 457, 650 N.E.2d 1108, 1113 (1995), and *Brown v. Ford Motor Co.*, 306 Ill. App. 3d 314, 318, 714 N.E.2d 556, 559 (1999). In each of those cases, the appellate court found that the trial court had not abused its discretion in barring the admission of evidence of preinjury, postsale remedial measures.

We do not believe that the trial court abused its discretion in admitting evidence of Ford's preinjury, postsale safety improvements to the Panther platform Police Interceptor on the issue of Ford's continuing duty to warn of a hazard that existed at the time of sale. Accordingly, we decline to follow *Carrizales* and its progeny on this issue, because we do not agree that the same policy considerations that bar the admission of *postaccident* remedial measures apply equally to *preinjury*, *postsale* safety measures.

First, *Hodges* demonstrates that the rule barring postaccident remedial measures was never intended to apply to preinjury remedial measures. As early as 1890, the supreme court allowed evidence of what occurred "before and at the time of the accident," including "that a valuable device for securing safety was known to the defendant, and its use neglected by him, before the accident." *Hodges*, 132 Ill. at 56, 23 N.E. at 424. The admission of such evidence was not believed to cause the same hesitation to adopt safety changes as the

53

admission of evidence of postaccident measures.

Second, while a manufacturer may be hesitant to adopt postaccident remedial measures if those measures are admissible as evidence to prove negligence in the case involving that accident, other policy considerations prevail preinjury. For example, when a manufacturer develops postsale safety measures to remedy a defect which existed at the time of sale, that manufacturer has a strong motivation to notify consumers of those measures in order to avoid future tort liability. Further, consumer demand for safe products provides an incentive for manufacturers to take steps to remedy defects.

Finally, if the policy goal is to promote the development of safer products, we believe that policy is better advanced by requiring manufacturers to inform consumers of safety measures which will remedy defects that already exist in products. In the context of product liability law, the policy behind the exclusion of postaccident remedial measures to prove negligence is to encourage manufacturers to develop safer products without a fear of liability for *past* acts. The policy goal in requiring manufacturers to notify consumers of postsale, preinjury remedial measures to correct existing hazards is to encourage manufacturers to develop safety features in order to avoid *future* liability. In our view, manufacturers are more likely to develop safer products if they are held accountable, on a continuing basis, for a failure to warn of hazards that they knew or should have known existed at the time the product was manufactured.

In this case, long before the design of the Panther platform vehicles, Ford's engineers had considered the potential for trunk contents to puncture the fuel tank in determining where the tank should be located. Despite notice of that hazard, and other hazards which could lead to the puncture of the fuel tank, Ford opted to design the Panther platform vehicles with a vertical-behind-the-axle fuel tank and to provide no warning of the hazard of trunk contents puncturing the tank in a high-speed rear-end collision. After the manufacture of the

Jablonski vehicle, but before the accident, in response to consumer demand, Ford developed shields and warnings for the purpose of protecting occupants of the Panther platform vehicles from the very hazards that caused the injuries and death in this case. Prior to this accident, Ford chose to warn police agencies, dealers, and government fleet owners of the development of these safety features, but it provided no warnings to consumers. Under these circumstances, we believe that the perpetuation of a rule which shields the manufacturer from liability does little to promote safe products. Accordingly, we find that the trial court did not abuse its discretion in allowing the introduction of the Panther platform Police Interceptor evidence on the issue of Ford's failure to warn.

2.

Prior Similar Incidents

Ford next challenges the introduction into evidence of the plaintiffs' exhibit consisting of a list of 416 alleged similar incidents involving postcollision fires in Ford vehicles. The evidence reveals that this list was compiled from Ford's answer to an interrogatory in another case in 1992 in which Ford was required to list all such accidents within its knowledge. The plaintiffs' expert, Mark Arndt, modified the answer to the interrogatory, which was more extensive, by making a separate list that included only those accidents involving Ford vehicles with aft-of-the-axle fuel tanks. The list includes only accidents in which the occupants were injured or killed in accidents in which postcollision fires occurred in rear-end collisions. That reduced list is the exhibit to which Ford objects.

"It is well established in Illinois that evidence of prior accidents is competent to show that the common cause of the accidents is a dangerous or unsafe thing or condition." *Bass v. Cincinnati, Inc.*, 180 Ill. App. 3d 1076, 1079, 536 N.E.2d 831, 832 (1989). In addition, "[e]vidence of prior similar occurrences is admissible for the purpose of demonstrating that a manufacturer possessed knowledge of a defect in a particular product prior to the accident

55

in the litigated case." *Holmes v. Sahara Coal Co.*, 131 Ill. App. 3d 666, 672, 475 N.E.2d 1383, 1387 (1985). "Evidence of prior accidents is admissible to demonstrate that a vehicle is dangerous if the proponent establishes that the accidents occurred in a substantially similar manner." *Davis v. International Harvester Co.*, 167 Ill. App. 3d 814, 825, 521 N.E.2d 1282, 1289 (1988). "It need not be shown that the accidents occurred in an identical manner. Substantial similarity is all that is required." *Rucker v. Norfolk & Western Ry. Co.*, 77 Ill. 2d 434, 441, 396 N.E.2d 534, 538 (1979). "The determination whether prior occurrences or accidents are substantially similar to the one at issue lies within the trial court's sound discretion." *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 786, 776 N.E.2d 262, 286 (2002).

The primary focus of the plaintiffs' claims in this case is that aft-of-the-axle fuel tanks are defective because they tend to rupture in rear-end collisions, causing postcollision fires, that Ford was aware of this defect, and that Ford was negligent in designing the Panther platform with an aft-of-the-axle fuel tank. Thus, evidence of prior similar accidents was relevant and admissible to prove that the design of the 1993 Lincoln Town Car was defective and unsafe and that Ford knew of its unsafe condition prior to the manufacture of the Jablonski vehicle. The list of 416 similar accidents only included rear-end collisions that caused postcollision fires in Ford vehicles with aft-of-the-axle fuel tanks as a result of the fuel tank being punctured in the accident. We find that the trial court did not abuse its discretion in determining that the accidents submitted were substantially similar to the accident in this case. Thus, the list of 416 similar incidents was properly admitted to prove both negligence and notice.

3.

2006 Federal Safety Standards

At the time the Jablonski vehicle was manufactured, FMVSS 301 required that a

vehicle withstand, with minimal fuel leakage, a rear impact with a nondeformable 4,000-pound barrier moving at 30 miles per hour. Ford was allowed to introduce evidence that the 1993 Lincoln Town Car met this standard, that Ford performed the certification testing, that the Town Car passed at 35 miles per hour, and that Ford also conducted internal testing which required that the vehicle pass three separate car-to-car fuel-system-integrity crashes at 50 miles per hour. After the accident in this case, the NHTSA adopted a new standard for FMVSS 301 which required that vehicles withstand a rear impact at 50 miles per hour, rather than 30 miles per hour, with the new standard applicable to 2006 model vehicles. For purposes of this litigation, Ford conducted crash testing under the new standard and determined that the 1993 Lincoln Town Car met that standard. Ford sought to introduce into evidence the crash testing it had performed and testimony that the Jablonski vehicle met the new standard. The trial court, without objection, allowed the introduction of the crash test, but it refused, as irrelevant, testimony that the 1993 Lincoln Town Car complied with the new NHTSA safety standard. Ford argues that the trial court abused its discretion in refusing evidence that the 1993 Lincoln Town Car met the version of FMVSS 301 first applicable to 2006 vehicles.

"[E]vidence of compliance with [f]ederal standards is relevant to the issue of whether a product is defective [citation], as well as the issue of whether a defective condition is unreasonably dangerous ***." *Rucker*, 77 Ill. 2d at 439, 396 N.E.2d at 536-37. Likewise, "[e]vidence of standards promulgated by industry, trade, or regulatory groups or agencies may be admissible to aid the trier of fact in determining the standard of care in a negligence action." *Ruffiner v. Material Service Corp.*, 116 Ill. 2d 53, 58, 506 N.E.2d 581, 584 (1987). However, that evidence is not conclusive. "The finder of fact may conclude that a product is in an unreasonably dangerous defective condition notwithstanding its conformity to [f]ederal standards." *Rucker*, 77 Ill. 2d at 440, 396 N.E.2d at 537. "To be admissible,

57

standards must be relevant 'in terms of both time and conduct involved.' " *Ruffiner*, 116 Ill. 2d at 58, 506 N.E.2d at 584 (quoting *Murphy v. Messerschmidt*, 68 Ill. 2d 79, 84, 368 N.E.2d 1299, 1302 (1977)). Evidence of proposed safety standards that have not been adopted is irrelevant and inadmissible. *Kelley v. American Motors Corp.*, 130 Ill. App. 3d 662, 678, 474 N.E.2d 814, 825 (1985).

We fail to see the relevance of a version of FMVSS 301 that was not adopted until after this accident occurred and was first applicable to 2006 vehicles. A federal motor vehicle safety standard that is not applicable to the vehicle in question does not meet the "time" requirement in order to be relevant. Here, the jury received evidence that the 1993 Lincoln Town Car passed the applicable version of FMVSS 301, and as will be discussed later, the jury was properly instructed on the significance of that standard. Further, although the 2006 standard was not admitted into evidence, Ford was allowed to introduce evidence that the Jablonski vehicle exceeded the standard applicable to its model year and, in addition, passed 50 mile-per-hour fuel-system-integrity testing. Under these circumstances, we do not believe that the trial court abused its discretion in refusing the admission of evidence of the 2006 standards.

C.

Jury Instructions and Special Interrogatories

Ford argues that the trial court erred and abused its discretion in refusing various instructions and special interrogatories it submitted at the jury instructions conference. We will review Ford's arguments pertaining to instructions on punitive damages later in this opinion. Here, we will address the trial court's rejection of Ford's instructions on the significance of federal motor vehicle safety standards, a verdict form allocating fault between Ford and Natalie Ingram, and special interrogatories. We review the trial court's decisions on the submission of jury instructions on an abuse-of-discretion standard. *Dillon*, 199 Ill.

58

2d at 505, 771 N.E.2d at 371.

1.

Instruction on Significance of Federal Motor Vehicle Safety Standards

Ford asserts that it was error for the trial court to refuse its nonpattern instruction which it characterizes as explaining the "significance" of federal motor vehicle safety standards. In that instruction, Ford sought to instruct the jury that NHTSA standards are prescribed to "meet the need for motor vehicle safety" and defined "motor vehicle safety" as the performance of a motor vehicle in a way that "protects the public against unreasonable risk of accidents *** and against unreasonable risk of death or injury in an accident." Although the trial court rejected this instruction, it gave another nonpattern instruction submitted by Ford which stated that FMVSS 301 was adopted to reduce "deaths and injuries occurring from fires that result from fuel spillage during and after motor vehicle crashes" and that "[i]f you find that the 1993 Lincoln Town [C]ar met or surpassed the requirements of this standard, that fact should be considered by you in deciding whether the vehicle was reasonably safe, but it is not conclusive."

As we previously noted, government standards are admissible evidence in a negligent-design case. *Ruffiner*, 116 Ill. 2d at 58, 506 N.E.2d at 584. However, compliance with government standards alone is not conclusive regarding whether a product is defective. *Rucker*, 77 Ill. 2d at 440, 396 N.E.2d at 537. Accordingly, we believe that the jury was properly instructed on the significance of evidence of compliance with the government standard. It is clear that the version of FMVSS 301 in effect when the Jablonski vehicle was manufactured is the government standard applicable to the circumstances of this case. Ford was allowed to introduce evidence that it met and surpassed that standard. The jury was instructed that compliance with the standard, although not conclusive, could be considered in determining whether the vehicle was reasonably safe. We believe that Ford's additional

59

instruction would have been confusing to the jury in that it instructed that compliance with government standards eliminates any "unreasonable risk" of accidents or injuries. Thus, the jury would have been instructed, on the one hand, that compliance with government standards is not conclusive on whether a product is "reasonably safe," but it would also have been instructed that the compliance is tantamount to eliminating any "unreasonable risk." We find that the trial court did not abuse its discretion in rejecting this instruction.

2.

Verdict Forms Allocating Fault

At the jury instructions conference, Ford submitted proposed verdict forms that would have required the jury to allocate fault between Ford and Natalie Ingram. Under the terms of section 2-1117 of the Code of Civil Procedure, a joint tortfeasor who the jury determines is less than 25% at fault is only severally liable for the damages remaining after the payment of medical expenses. 735 ILCS 5/2-1117 (West 2004). Ford sought to have any negligence assessed against it compared to the fault of Ingram and to argue that its portion of the total fault was less than 25%. The trial court followed the controlling precedent in this district and rejected Ford's proposed verdict forms. When this case was briefed and argued, there was a conflict between this district and the Fourth District of the appellate court regarding whether a defendant who settles before trial should be included in the jury's apportionment of fault under section 2-1117. See *Blake v. Hy Ho Restaurant, Inc.*, 273 Ill. App. 3d 372, 652 N.E.2d 807 (1995) (the Fifth District held that a settling tortfeasor should not be included in the jury's apportionment of fault); *Skaggs v. Senior Services of Central Illinois, Inc.*, 355 Ill. App. 3d 1120, 823 N.E.2d 1021 (2005) (the Fourth District concluded that the jury should be informed about a settling tortfeasor under section 2-1117).

The foregoing conflict has now been resolved by the Illinois Supreme Court. In *Ready v. United/Goedecke Services, Inc.*, 232 Ill. 2d 369, 905 N.E.2d 725 (2008), the court

held that settling tortfeasors should not be included in the apportionment of fault pursuant to section 2-1117. Accordingly, the trial court did not abuse its discretion in refusing Ford's proposed verdict forms.

3.

Special Interrogatories

Ford argues that it is entitled to a new trial because the trial court improperly refused its four special interrogatories. The special interrogatories Ford tendered were as follows:

"Is the 1993 Lincoln Town Car reasonably safe for all reasonably intended uses?" Ford's proposed instruction No. 26.

"Did Ford Motor Company fail to use ordinary care for the safety of Dora Mae Jablonski?" Ford's proposed instruction No. 27.

"Did Ford Motor Company fail to use ordinary care for the safety of John L. Jablonski, Sr.?" Ford's proposed instruction No. 28.

"Did Ford Motor Company act in a way which shows utter indifference to or conscious disregard for the safety of Dora Mae Jablonski?" Ford's proposed instruction No. 29.

Special interrogatories are governed by section 2-1108 of the Code of Civil Procedure, which provides as follows:

"Unless the nature of the case requires otherwise, the jury shall render a general verdict. The jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing. Special interrogatories shall be tendered, objected to, ruled upon[,] and submitted to the jury as in the case of instructions. Submitting or refusing to submit a question of fact to the jury may be reviewed on appeal, as a ruling on a question of law. When the special finding of fact is inconsistent with the

61

general verdict, the former controls the latter and the court may enter judgment accordingly." 735 ILCS 5/2-1108 (West 2004).

Ford argues that the court should have given all four of its special interrogatories because they were all in proper form. The plaintiffs respond that the interrogatories were not in proper form, failed to include critical and necessary elements of the cause of action, would have confused or misled the jury, and could not have controlled the general verdict because the answers, whether yes or no, would not have been inconsistent with a general verdict.

The general rules concerning special interrogatories are well-established. Special interrogatories serve as the " 'guardian of the integrity of a general verdict in a civil jury trial.' " *Simmons v. Garces*, 198 Ill. 2d 541, 555, 763 N.E.2d 720, 730 (2002) (quoting *O'Connell v. City of Chicago*, 285 Ill. App. 3d 459, 460, 674 N.E.2d 105, 106 (1996)). The purpose of a special interrogatory is that "[i]t tests the general verdict against the jury's determination as to one or more specific issues of ultimate fact." *Simmons*, 198 Ill. 2d at 555, 763 N.E.2d at 730. "In determining whether answers to special interrogatories are inconsistent with a general verdict, all reasonable presumptions are exercised in favor of the general verdict." *Simmons*, 198 Ill. 2d at 556, 763 N.E.2d at 730.

"A special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend[] and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned. [Citations.] Special findings are inconsistent with a general verdict only where they are 'clearly and absolutely irreconcilable with the general verdict.' [Citation.] If a special interrogatory does not cover all the issues submitted to the jury and a 'reasonable hypothesis' exists that allows the special finding to be construed consistently with the general verdict, they are not 'absolutely irreconcilable' and the special finding will not control. [Citation.]" *Simmons*, 198 Ill. 2d at 555-56, 763 N.E.2d at 730.

62

If a special interrogatory is in proper form, it must be given, but the failure to do so may be harmless error. *McGovern v. Kaneshiro*, 337 Ill. App. 3d 24, 30, 785 N.E.2d 108, 114 (2003). Our review of a trial court's refusal to give a special interrogatory is *de novo*. *Hooper v. County of Cook*, 366 Ill. App. 3d 1, 6, 851 N.E.2d 663, 668 (2006).

The statutory provisions requiring that a special interrogatory be given if in proper form and that a special finding controls an inconsistent general verdict are merely codifications of the common law. *Albaugh v. Cooley*, 87 Ill. 2d 241, 252, 429 N.E.2d 837, 842 (1981). The reason behind the rule is the belief "that a jury more clearly understands a particularized special interrogatory than a composite of all of the questions in a case, and therefore a special finding upon which a jury presumably has more intensively focused its attention should prevail over an inconsistent general verdict." *Borries v. Z. Frank, Inc.*, 37 Ill. 2d 263, 266, 226 N.E.2d 16, 19 (1967). However, as one court noted:

> "The argument could be made that special interrogatories frequently do not achieve their purpose and often disrupt a trial with a result not understood by the jury and not expected by the court or the parties. The possibility of an unintended, unreasoned result is made more likely by the fact that the court and counsel are severely restricted in their discussion of a special interrogatory. *** In a jurisdiction where no comment is allowed on the special interrogatory it is very important that the special interrogatory be carefully worded." *Blakey v. Gilbane Building Corp.*, 303 Ill. App. 3d 872, 880-81, 708 N.E.2d 1187, 1193-94 (1999).

Particular attention must be given to the wording of a special interrogatory seeking to test a general verdict on the issue of negligence when the plaintiff has alleged multiple theories of negligence. *Northern Trust Co. v. University of Chicago Hospitals & Clinics*, 355 Ill. App. 3d 230, 252, 821 N.E.2d 757, 777 (2004). In those cases, in order to be in proper form, the interrogatory must consist of a single question that, standing alone, would

control the verdict on all the theories of negligence. *Northern Trust Co.*, 355 Ill. App. 3d at 252, 821 N.E.2d at 776-77. If a special interrogatory covers only one of the plaintiff's two theories of negligence, it is not in proper form since an answer contrary to a general verdict would not be inconsistent with the remaining theory of negligence. *Stach v. Sears, Roebuck & Co.*, 102 Ill. App. 3d 397, 411, 429 N.E.2d 1242, 1252 (1981). Accordingly, if a reasonable hypothesis exists that a special interrogatory seeking to test a general verdict on the issue of negligence could be understood by the jury to include less than all the theories of negligence asserted by the plaintiff, the interrogatory is not in proper form and should not be given.

In this case, each of the special interrogatories submitted by Ford appears to be designed to test the jury's verdict on either the issue of negligence or the issue of willful and wanton conduct. The plaintiffs submitted multiple claims of negligence to be determined by the jury. Those claims included allegations of both a negligent design and a failure to warn. The same allegations of negligence were submitted as claims of willful and wanton conduct for Dora's claim for punitive damages. The jury was instructed in the burden-of-proof instructions that it should find for the plaintiffs if it determined that Ford was negligent or guilty of willful and wanton conduct "in one of the ways" claimed by the plaintiffs. This was a complicated product liability case in which the jury heard extensive testimony from expert witnesses offering divergent opinions on the design of the fuel tank in the Jablonskis' 1993 Lincoln Town Car and the potential danger of items in the trunk puncturing the fuel tank in a high-speed rear-end collision. Thus, the special interrogatories submitted required careful scrutiny to be certain that the jury could not interpret an interrogatory to include less than all the plaintiffs' claims so that an answer would be "absolutely irreconcilable" with a contrary general verdict. Having carefully considered the special interrogatories submitted by Ford in the context of the evidence and instructions in this case, we believe that the trial

64

court correctly refused to submit them to the jury.

In its proposed instruction No. 26, Ford sought to ask the jury as follows: "Is the 1993 Lincoln Town Car reasonably safe for all reasonably intended uses?" This interrogatory could reasonably be understood to only address the negligent-design claims and not the allegations of a failure to warn. The court gave the jury multiple instructions on the issue of duty. At the request of the plaintiffs, the court gave plaintiffs instruction No. 25, which stated that a manufacturer is "under a duty to *make a product* which is reasonably safe for all reasonably intended uses." (Emphasis added.) The special interrogatory generally tracked the language of that instruction. However, at the request of Ford, the court gave two additional instructions on the issue of duty. Defendant's instruction No. 1 informed the jury as follows: "[I]t was the duty of the defendant to use ordinary care for the safety of plaintiffs with respect to the design of the 1993 Lincoln Town Car." Defendant's instruction No. 2 advised as follows: "To establish a negligence claim for a failure to warn, the plaintiff must prove that the defendant knew or should have known, in the exercise of ordinary care, that the product was unreasonably dangerous and defendant failed to warn of its dangerous propensity." The jury could have easily interpreted these various instructions so that the special interrogatory would be understood to only pertain to Ford's duty to "make a product" to the exclusion of any duty to warn. Thus, under the instructions given by the court, if the jury determined that Ford was negligent in failing to warn, but not in the design of the fuel tank, a reasonable hypothesis exists that the jury could have answered the interrogatory "yes" and still entered a general verdict for the plaintiffs. In those circumstances, the answer to the special interrogatory would not be "absolutely irreconcilable" with the general verdict. For these reasons, we believe that the foregoing special interrogatory submitted by Ford as defendant's instruction No. 26 was confusing and ambiguous, and the trial court was correct in refusing it.

65

We next examine the special interrogatories submitted as defendant's instruction Nos. 27 and 28, which are identical except for the name of the plaintiff. Each interrogatory asks, "Did Ford Motor Company fail to use ordinary care for the safety of [Dora Mae Jablonski or John L. Jablonski, Sr.]?" These interrogatories are too vague and ambiguous in that they do not explicitly cover all the plaintiffs' allegations of negligence. For example, the question that needed to be asked was, "Did Ford Motor Company fail to use ordinary care for the safety of [Dora Mae Jablonski or John L. Jablonski, Sr.] *in any of the ways claimed by [the plaintiffs]*?" If the jury answered this more specific question "no" and rendered a general verdict for the plaintiffs, the answer would be absolutely irreconcilable with the verdict. However, the jury could just as easily have interpreted the general interrogatories submitted by Ford to ask, "Did Ford Motor Company fail to use ordinary care for the safety of [Dora Mae Jablonski or John L. Jablonski, Sr.] *in all of the ways claimed by [the plaintiffs]*?" In that case, the jury could have answered the question "no" even though it found that Ford was negligent in one or more of the ways claimed by the plaintiffs and entered a general verdict for the plaintiffs. The interrogatories, as submitted by Ford, are simply not sufficiently specific in this case to cover all the allegations of negligence. Consequently, a reasonable hypothesis exists that an answer to the interrogatories would not be inconsistent with a general verdict. Accordingly, the trial court was correct in refusing Ford's special interrogatories submitted as defendant's instruction Nos. 27 and 28.

Finally, we turn to Ford's fourth special interrogatory, submitted as defendant's instruction No. 29, which asked as follows: "Did Ford Motor Company act in a way which shows utter indifference to or conscious disregard for the safety of Dora Mae Jablonski?" This interrogatory suffers from the same defect discussed in the preceding paragraph. It is simply not sufficiently specific to cover all the allegations of willful and wanton conduct and is therefore subject to an interpretation by the jury that would not result in an answer which

66

is absolutely irreconcilable with a general verdict. The trial court was correct in refusing the special interrogatory submitted by Ford as defendant's Instruction No. 29.

We reiterate that our determination of whether the special interrogatories submitted in this case were in proper form is based upon the context of the parties' claims and the instructions given by the court. Special interrogatories are to be read in the context of the court's other instructions, which set forth the claims of the parties, to determine how the interrogatories might be interpreted by the jury and whether the jury might be confused. *Simmons*, 198 Ill. 2d at 564, 763 N.E.2d at 735. In a complex case involving multiple allegations of negligence and willful and wanton conduct, it is imperative that special interrogatories designed to test the jury's verdict upon those issues be carefully worded so that there is no question that an inconsistent answer is absolutely irreconcilable with a general verdict. To do otherwise is to risk "[t]he possibility of an unintended, unreasoned result." *Blakey*, 303 Ill. App. 3d at 881, 708 N.E.2d at 1193. We find that the trial court did not err in refusing the special interrogatories submitted by Ford.

D.

Punitive Damages

We finally consider the issues raised by Ford in regard to the jury's award of $15 million in punitive damages to plaintiff Dora Jablonski. Ford first argues that the trial court erred in submitting the punitive-damages claim to the jury because insufficient evidence was introduced to support an award of punitive damages and that it is therefore entitled to the entry of a judgment notwithstanding the verdict on that issue. Ford also claims that the submission of the plaintiffs' willful-and-wanton-conduct claim on an allegation of a postsale duty to warn was error entitling it to a new trial. In the alternative, Ford asserts that the trial court erred in refusing certain nonpattern jury instructions it tendered on the issue of punitive damages, entitling Ford to a new trial. Ford makes no claim that the amount of punitive

67

damages awarded was excessive.

Dora responds that there was ample evidence to justify the trial court's submission of the punitive-damages claim to the jury. Further, Dora argues that it was proper for the trial court to submit the postsale-duty-to-warn allegation but that, in any event, Ford cannot prove prejudice in the submission of that allegation since it did not submit special interrogatories to determine upon which allegations of willful and wanton conduct the jury found Ford liable and Ford is therefore bound by the general verdict on punitive damages. As to the nonpattern jury instructions submitted by Ford, Dora argues that the jury was properly instructed with pattern instructions on willful and wanton conduct and punitive damages and that Ford's proposed instructions were properly rejected. We examine each of Ford's claims in detail below.

1.

The Trial Court's Submission of the Punitive Damages Claim

In Illinois, a plaintiff is not allowed to seek punitive damages without first obtaining leave of court. The Code of Civil Procedure provides, in pertinent part, as follows:

"In all actions on account of bodily injury or physical damage to property, based on negligence, or product liability based on any theory or doctrine, where punitive damages are permitted no complaint shall be filed containing a prayer for relief seeking punitive damages. However, a plaintiff may, pursuant to a pretrial motion and after a hearing before the court, amend the complaint to include a prayer for relief seeking punitive damages. The court shall allow the motion to amend the complaint if the plaintiff establishes at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." 735 ILCS 5/2-604.1 (West 2004).

In this case, Dora filed a pretrial motion, pursuant to the above statute, requesting that

68

she be allowed to pursue a claim for punitive damages based upon willful and wanton conduct. The motion was supported by the affidavit of an expert which generally set forth the same evidence that the plaintiffs ultimately produced at the trial. Ford countered the motion with a written objection and the affidavit of its expert, Jack Ridenour, which generally set forth the evidence Ford offered at the trial in defense of the plaintiffs' claims. The court conducted a hearing upon the motion, at which oral arguments were heard, and then granted the motion, allowing Dora to amend her pleadings to claim willful and wanton conduct and to seek punitive damages. Ford does not claim error in this ruling, or even discuss it in its brief. Rather, Ford argues that the trial court erred in "submitting" the punitive-damages claim to the jury and in failing to grant Ford a judgment notwithstanding the verdict on that claim.

"It has long been established in this [s]tate that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence[,] or oppression[] or when the defendant acts willfully[] or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359 (1978). Thus, it has long been recognized in Illinois product liability cases that "where there is evidence of wilful and wanton conduct, punitive damages may be allowed." *Moore*, 116 Ill. App. 2d 109, 135, 253 N.E.2d 636, 648 (1969), *aff'd on other grounds*, 46 Ill. 2d 288, 263 N.E.2d 103 (1970) . Punitive damages are not favored in the law, and are not awarded as compensation, but may be awarded in a proper case "to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future." *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414, 563 N.E.2d 397, 401 (1990). "In a products liability case, the goal of awarding punitive damages is to deter manufacturers from placing dangerously defective products into the stream of commerce by making it unprofitable to an unpredictable degree." *Baier v. Bostitch*, 243 Ill.

69

App. 3d 195, 205, 611 N.E.2d 1103, 1110 (1993). In the context of a punitive-damages claim, willful and wanton conduct " ' "approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it." ' " *Loitz*, 138 Ill. 2d at 416, 563 N.E.2d at 402 (quoting *Bresland v. Ideal Roller & Graphics Co.*, 150 Ill. App. 3d 445, 457, 501 N.E.2d 830, 839 (1986) (quoting Restatement (Second) of Torts §886A, Comment *k* (1979))). "The essential elements of wilful and wanton conduct in a product liability case include knowledge of the defect, knowledge or notice that the defect was likely to cause injury[,] and failure to warn of or remedy a known defect or take some other affirmative action to avoid the injury." *Collins v. Interroyal Corp.*, 126 Ill. App. 3d 244, 256, 466 N.E.2d 1191, 1199 (1984).

"Appropriately enough, the initial decision whether punitive damages may be imposed in a particular case in this [s]tate is a matter normally reserved to the trial judge." *Loitz*, 138 Ill. 2d at 414, 563 N.E.2d at 401. The determination of whether punitive damages are available as a matter of law for the cause of action is reviewed *de novo*. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1138, 818 N.E.2d 357, 367 (2004).

> "The trial court submits the issue of punitive damages to the jury when it determines that, as a matter of law, the evidence will support an award of punitive damages. [Citation.] In other words, the trial court may submit the issue of punitive damages to the jury only if the plaintiff has made out a *prima facie* case for such damages. [Citation.] This decision to submit the question to the jury is a matter reserved to the trial court and will not be reversed absent abuse of discretion." *Franz*, 352 Ill. App. 3d at 1138, 818 N.E.2d at 367.

When faced with conflicting evidence, "the question of whether a defendant's conduct was sufficiently willful or wanton to justify the imposition of punitive damages is for the jury to

decide." *Cirrincione v. Johnson*, 184 Ill. 2d 109, 116, 703 N.E.2d 67, 70 (1998). Thus, the factual finding by the jury on the issue of whether the defendant has committed willful and wanton conduct that would support a claim for punitive damages is reviewed under a manifest-weight standard. *Franz*, 352 Ill. App. 3d at 1138, 818 N.E.2d at 367.

Here, we find no error in the trial court's initial decision to allow Dora to proceed with a willful-and-wanton-conduct claim for punitive damages or its decision to submit the punitive-damages claim to the jury. We see no need to restate all the evidence in support of the punitive-damages claim, but we will summarize. The plaintiffs presented significant evidence in support of their claim that Ford's Panther platform vehicles are defective in that the aft-of-the-axle location of the unshielded fuel tank renders them susceptible to postcrash fires in high-speed rear-end collisions because the fuel tank is crushed or breached, causing gasoline to spill and ignite. Evidence of this claim was presented by expert testimony and by the presentation of numerous substantially similar accidents that resulted in severe injuries and deaths. The plaintiffs offered evidence of Ford's knowledge of the alleged defective condition of the Panther platform vehicles through proof that Ford was aware of the many prior similar occurrences and evidence that, long before the Panther platform was manufactured, a researcher funded by Ford, as well as Ford's own engineers, had recommended that a safer design was to place the fuel tank above the axle. Well before the Jablonski accident, Ford adopted a policy of placing the fuel tank forward of the axle in all new passenger automobile designs. Finally, the evidence offered by the plaintiffs revealed that, prior to the Jablonski accident, Ford did nothing to warn civilian users of Panther platform vehicles of the potential danger, did nothing to remedy the defect, and took no other action to avoid injuries caused by the defect. In fact, the evidence reveals that it was not until mounting complaints led to a NHTSA investigation, and the state police agencies of at least two states demanded action, that Ford addressed the problem. Once Ford

71

acknowledged the need for corrective action, in less than a year it developed relatively simple design modifications that resulted in the modified Panther platform vehicle passing a 75-mile-per-hour rear-end crash test, but it took no action to warn or otherwise remedy the danger for civilian users such as the Jablonskis.

Despite the foregoing evidence, Ford argues that under the analysis in *Loitz*, the plaintiff in this case failed to present sufficient evidence of willful and wanton conduct to justify an award of punitive damages. *Loitz*, 138 Ill. 2d 404, 563 N.E.2d 397. In *Loitz*, the plaintiff, who was injured when the barrel of the shotgun he was using exploded, based his claim that the defendant manufacturer had notice of a defect upon a relatively small number of prior similar claims. The supreme court held, "Guns are inherently dangerous instrumentalities, and the mere occurrence of other explosions does not, without more, establish outrageous misconduct or some other basis sufficient to warrant the imposition of punitive damages." *Loitz*, 138 Ill. 2d at 419, 563 N.E.2d at 404. The evidence in this case is easily distinguishable from *Loitz*.

Here, although the evidence of Panther platform vehicles involved in prior similar occurrences represented a small percentage of the total Panther platform vehicles manufactured, additional evidence presented by the plaintiffs revealed that Panther platform vehicles had a higher rate of postcollision fires when subjected to high-speed rear-end collisions than vehicles designed with a forward-of-the-axle fuel tank. This evidence was compiled by a Ford employee prior to the accident in this case. In addition, unlike *Loitz*, Ford's own engineers had advised it not to use aft-of-the-axle fuel tanks in its vehicles long before the Panther platform was manufactured, due to safety concerns related to postcrash fires, including a concern that articles in the trunk could breach the fuel tank.

We believe that this evidence clearly supports the trial court's decision to submit Dora's punitive-damages claim to the jury. Dora presented a *prima facie* case and the trial

court did not abuse its discretion in submitting the claim. Likewise, we do not believe that the decision of the jury to award punitive damages is against the manifest weight of the evidence. Certainly, Ford presented conflicting evidence to explain its actions and offered the testimony of experts that Panther platform vehicles are not defective. In the end, however, the jury resolved the conflicting evidence in favor of the plaintiff and awarded punitive damages. We see no reason to grant Ford a judgment notwithstanding the verdict. Viewing all the evidence in the light most favorable to the plaintiff, we conclude that the decision of the jury to award punitive damages was well-justified.

2.

Willful and Wanton Postsale-Failure-to-Warn Claim

Next, Ford claims that it was error for the trial court to submit Dora's postsale-failure-to-warn allegation on the willful-and-wanton-conduct claim and that it is therefore entitled to a new trial on the issue of punitive damages. In addition to claiming that Ford was negligent by "[f]ailing to inform of the existence of the Trunk Pack and/or Trunk Pack Recommendations," Dora also alleged that the failure amounted to willful and wanton conduct. Ford makes the same objection to the submission of this willful-and-wanton-conduct claim to the jury as it did to the negligence claim. Both parties' arguments are essentially the same.

We have already extensively analyzed this issue in this opinion and we see no need for further discussion. As with the negligence claims, the willful-and-wanton-conduct claim was submitted on four separate theories, and a general verdict was entered on that claim. We have held that the trial court did not err in submitting the willful-and-wanton-conduct claim on at least some of the plaintiffs' theories. Since Ford did not submit special interrogatories to determine upon which theories the jury decided that Ford had engaged in willful and wanton conduct, it is unable to show prejudice from the submission of the alleged postsale-

73

duty-to-warn theory, even if the submission of that theory was error. See *Witherell*, 118 Ill. 2d at 329, 515 N.E.2d at 72 ("When there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the defendant, having failed to request special interrogatories, cannot complain"). We hold that Ford is not entitled to a new trial on punitive damages as a result of the submission of the postsale-duty-to-warn claim.

3.

Ford's Nonpattern Instruction No. 20

Ford argues that the trial court erred and violated due process by refusing its proposed instruction No. 20 on the issue of punitive damages. That instruction stated as follows:

> "You may award punitive damages only if you find by clear and convincing evidence that Ford Motor Company employees had no arguably legitimate reasons for concluding that the 1993 Lincoln Town Car was reasonably safe. You may not award punitive damages if reasonable people can disagree about whether the 1993 Lincoln Town Car was reasonably safe."

In the trial court, Ford claimed that this instruction was modified from Illinois Pattern Jury Instructions, Civil, No. 35.02 (2005) (IPI Civil 2005). We fail to see any similarity between the proposed instruction and IPI Civil 35.02, which instructs juries that they cannot assess punitive damages against a corporate defendant based upon the actions of its employees unless one or more of certain conditions apply. Therefore, we find that it is a nonpattern instruction and apply the rules accordingly.

The law is clear that if a pattern instruction is available in a civil case, it is to be used, "giving due consideration to the facts and the prevailing law," unless the court determines that it does not accurately state the law. 177 Ill. 2d R. 239(a). Regardless of which instructions were given and which were refused, our task is essentially to discern whether

the jury was given an accurate statement of the law from which to decide the issues.

In the present case, the court gave the jury five pattern instructions submitted by Dora on her claim for punitive damages. The jury was instructed (1) with IPI Civil (2005) 20.01.01, an issues instruction that defined the issues in the claim of willful and wanton conduct, (2) with IPI Civil (2005) 21.02.02, a burden-of-proof instruction that detailed what Dora was required to prove on the willful-and-wanton-conduct claim, (3) with IPI Civil (2005) 14.04, a duty instruction that stated that it was Ford's duty "before and at the time of the occurrence, to refrain from willful and wanton conduct which would endanger the safety of Dora Jablonski," (4) with IPI Civil (2005) 14.01, a definition instruction that defined "willful and wanton conduct" as "a course of action which shows an utter indifference to or conscious disregard for the safety of others," and (5) with IPI Civil (2005) 35.01, which advised the jury that if it found that Ford's conduct "was willful and wanton and proximately caused" Dora's injury and that if the jury believed "that justice and the public good require it," punitive damages "may" be awarded "to punish the Defendant Ford Motor Company and to deter Ford Motor Company and others from similar conduct." In addition to the foregoing, the trial court gave two nonpattern instructions on punitive damages submitted by Ford: (1) an instruction advising the jury that the plaintiffs' burden of proof on punitive damages was "by clear and convincing evidence" and (2) an instruction advising the jury that in determining the proper amount of punitive damages, it could not consider Ford's "wealth or size."

We find that the trial court did not abuse its discretion in refusing to give the jury Ford's proposed instruction No. 20. It is a nonpattern instruction that does not accurately state the law, and the jury was otherwise accurately instructed about punitive damages. By submitting a nonpattern instruction that would have prohibited the jury from awarding punitive damages if reasonable people could disagree about whether the 1993 Lincoln Town

75

Car was reasonably safe, Ford was attempting to create a new standard for punitive damages that has never existed in Illinois law, a standard that would not allow punitive damages if a defendant manufacturer could find an expert to claim that the product in question was reasonably safe. That is, quite simply, not the law. In a previous section, we have reviewed the law pertaining to the circumstances under which punitive damages may be awarded in a products liability case, and we believe that the instructions given by the trial court accurately instructed the jury.

Ford submitted a jury instruction which essentially advised the jury that it could not find for the plaintiffs if the parties presented conflicting testimony from expert witnesses. In this case, the jury was presented with conflicting evidence on the claim of willful and wanton conduct. The jury was free to accept the evidence presented by Dora and reject the evidence presented by Ford. We hold that Ford's proposed instruction No. 20 did not advise the jury of the proper standard for awarding punitive damages, and the trial court did not abuse its discretion in refusing it.

Based upon our ruling that Ford's proposed instruction No. 20 did not accurately state the law and was, therefore, properly refused, we also reject Ford's related argument that it was denied due process by the exclusion of this instruction. It is elementary that a party has no due process right to instructions that do not accurately state the law. 177 Ill. 2d R. 239(a). Ford argues that the trial court's refusal to give this proposed instruction "was not simply an error under Illinois law[;] it also rendered the I.P.I. Civil standard for awarding punitive damages unconstitutionally vague *as applied to this case.*" (Emphasis in original.) We disagree. Ford and other manufacturers should have known the standard for the imposition of punitive damages for several decades. See *Moore*, 116 Ill. App. 2d at 135-36, 253 N.E.2d at 648-49 ("It is well established in Illinois that where there is evidence of wilful and wanton conduct, punitive damages may be allowed. *** The question of wilful and wanton conduct

76

is essentially whether the failure to exercise care is so gross that it shows a lack of regard for the safety of others") *aff'd on other grounds*, 46 Ill. 2d 288, 263 N.E.2d 103 (1970); *Collins*, 126 Ill. App. 3d at 256, 466 N.E.2d at 1199 ("Punitive damages based on wilful and wanton conduct are allowed in product liability actions where there is evidence of conscious disregard for the safety of others").  Ford was not denied due process by the trial court's rejection of its proposed instruction No. 20.

4.

Ford's Nonpattern Instruction Nos. 15 and 19

Ford's final argument is that it was denied due process by the trial court's rejection of two nonpattern instructions Ford claims were required by decisions of the United States Supreme Court.  Ford's proposed instructions provided as follows:

"You may not award any punitive damages for the purpose of punishing Ford Motor Company for the sale of vehicles in other states, for any injuries that may have occurred in other states, or for the purpose of changing Ford Motor Company's conduct outside the State of Illinois."  Ford's proposed instruction No. 15.

"Any individuals other than the plaintiff who might claim to have been harmed by the defendant have the right to bring their own lawsuit seeking compensatory and punitive damages for the wrong, if any done to them.  Therefore, if you decide to impose punitive damages, you may not impose punitive damages for the purpose of punishing the defendant for any wrong except the wrong done to the plaintiffs in this case."  Ford's proposed instruction No. 19.

In a series of recent decisions, the United States Supreme Court has provided guidelines to aid state courts in preventing the imposition of *excessive* punitive-damage awards.  *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 113 L. Ed. 2d 1, 111 S. Ct. 1032 (1991) (while an excessive punitive-damages award may violate the due process

77

clause, the common law method of assessing punitive damages is not *per se* unconstitutional); *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 125 L. Ed. 2d 366, 113 S. Ct. 2711 (1993) (although no mathematical bright-line test can be formulated to determine whether a punitive-damages award is constitutionally excessive, a general concern of "reasonableness," under the circumstances of a particular case, must be considered); *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996) (while evidence of out-of-state transactions is relevant to the degree of reprehensibility of the defendant's conduct, a state court may not sanction procedures that punish a defendant in order to deter conduct which is lawful in other states); *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 155 L. Ed. 2d 585, 123 S. Ct. 1513 (2003) (due process does not allow a state to punish a defendant for out-of-state conduct that is lawful where it occurred or to adjudicate other parties' hypothetical claims under the guise of a reprehensibility analysis); *Philip Morris USA v. Williams*, 549 U.S. 346, 166 L. Ed. 2d 940, 127 S. Ct. 1057 (2007) (while a jury may be allowed to consider harm to nonparties in determining the degree of the reprehensibility of the defendant's conduct, the jury must be instructed, upon request, not to punish the defendant for harm to nonparties).

We see no need for an extensive analysis of the foregoing cases since this case is clearly distinguishable. In each of the above cases, the defendant appealed the punitive-damages award, arguing that it was excessive. The only issue in those cases concerned the *amount* of the punitive damages awarded. The Supreme Court rulings cited by Ford did not implicate in any way a defendant's *liability* for a punitive-damages award. The Supreme Court promulgated guidelines for trial courts to follow to decrease the likelihood of an excessive award, and for reviewing courts to follow, once a decision had been made that the defendant was liable for punitive damages, to determine whether the amount awarded was unconstitutionally excessive.

Here, Ford makes no claim that the amount of the punitive damages awarded is excessive. Instead, Ford argues only that the foregoing decisions are equally applicable to whether Ford is liable for punitive damages, and Ford requests a new trial on its liability for punitive damages. In fact, Ford seeks to bootstrap its argument into a claim that it is entitled to a new trial on all the issues. We disagree with Ford's argument. We believe that the authorities upon which Ford relies are limited to claims of excessive punitive damages, and we hold that, in the absence of such a claim, Ford has waived any error in the trial court's failure to submit Ford's proposed jury instructions.

We find no authority for Ford's argument that the failure to give its proposed instructions requires a new trial on its liability for punitive damages, much less a new trial on all the issues. In fact, in each of the cases Ford cites as examples of decisions reversing a punitive-damages award for a failure to give similar instructions, the defendant argued that the award was excessive, and the court's remand of the case was limited to a new determination of the amount of the award. See *White v. Ford Motor Co.*, 500 F.3d 963 (9th Cir. 2007) (the district court erred in failing to instruct the jury that it could not punish Ford for harm to nonparties, and the cause was remanded for a new trial on the amount of punitive damages); *Sand Hill Energy, Inc. v. Smith*, 142 S.W.3d 153 (Ky. 2004) (the failure to instruct the jury that it could not punish defendant Ford for out-of-state conduct was error, and the cause was remanded for a new trial limited to the amount of the punitive-damages award); *Estate of Schwarz v. Philip Morris Inc.*, 206 Or. App. 20, 135 P.3d 409 (2006) (the failure to instruct the jury that it could not punish the defendant for the impact of its conduct on individuals in other states was error, and the cause was remanded for a new trial limited to a determination of the amount of punitive damages), *appeal allowed*, 346 Or. 213, 208 P.3d 963 (2009).

Indeed, there are good reasons that Ford has not claimed that the punitive-damages

award in this case is excessive or asked this court to remand for a new trial on the amount of the award. In all of the cases discussed above, the jury awarded punitive damages that were multiples of the compensatory damages awarded. In one case affirmed by the Supreme Court, the punitive-damages award was 526 times the compensatory-damages award (*TXO Production Corp.*, 509 U.S. at 453, 125 L. Ed. 2d at 376, 113 S. Ct. at 2718), although the Court has since expressed the view that a punitive-damages award more than a single-digit multiple of compensatory damages may be suspect in a due process analysis (*State Farm Mutual Automobile Insurance Co.*, 538 U.S. at 425, 155 L. Ed. 2d at 605-06, 123 S. Ct. at 1524). Here, the punitive-damages award was *less* than the compensatory-damages award.

Thus, Ford finds itself in a difficult situation in its challenge to the punitive-damages award. If it argues that the award is excessive and the award is reversed as a result of the trial court's failure to give its proposed instructions, any new trial would be limited to the amount of the punitive-damages award. However, Ford clearly does not want a new trial limited to the amount of punitive damages because a new award may be higher. As a result, Ford limits its argument on appeal to an attempt to extend the holdings of the Supreme Court to allow a new trial on its liability for punitive damages or, in the alternative, on all the issues. We have already held that the trial court did not err in submitting the issue of punitive damages to the jury and that the jury's decision to render a punitive-damages award is not against the manifest weight of the evidence. We decline to extend the Supreme Court's due process analysis of excessive punitive-damage awards to the issue of liability for punitive damages. By making no claim that the punitive-damages award is excessive or requesting a new trial on the amount of punitive damages, Ford has waived any error in the trial court's failure to give its proposed instructions.

## CONCLUSION

We have carefully reviewed the extensive record in this case and considered the

80

myriad issues raised by Ford.  We firmly believe that the parties received a fair trial in this case. The jury heard extensive evidence from both sides, and the contested issues were fully and fairly presented.  As one court succinctly noted in a similar case: "Both sides presented lengthy and conflicting testimony from a long list of experts.  The jury made its decision." *Carillo v. Ford Motor Co.*, 325 Ill. App. 3d 955, 966, 759 N.E.2d 99, 107 (2001).

We find no reversible error and therefore affirm the judgment in its entirety.


Affirmed.


DONOVAN and SPOMER, JJ., concur.

NO. 5-05-0723

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| DORA MAE JABLONSKI and JOHN L. JABLONSKI, JR., as Special Administrator and Personal Representative of the Estate of John L. Jablonski, Sr., | ) ) ) ) | Appeal from the Circuit Court of Madison County. |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 03-L-2027 |
| | ) | |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NATALIE S. INGRAM, | ) | Honorable |
| | ) | A. A. Matoesian, |
| Defendant. | ) | Judge, presiding. |

**Opinion Filed**: February 1, 2010

**Justices**: Honorable Bruce D. Stewart, J.,

Honorable James K. Donovan, J., and
Honorable Stephen L. Spomer, J.,
Concur

**Attorneys for Appellant**: Dan H. Ball, Elizabeth C. Carver, Alan J. Dixon, Peter W. Herzog III, Stephen G. Strauss, Thomas C. Walsh, Bryan Cave LLP, One Metropolitan Square, 211 N. Broadway, Suite 3600, St. Louis, MO 63102

**Attorneys for Appellees**: Bradley M. Lakin, Charles W. Chapman, Gerald R. Walters, Gail G. Renshaw, The Lakin Law Firm, P.C., 300 Evans Avenue, P.O. Box 229, Wood River, IL 62095